**BURSOR & FISHER, P.A.**
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: jwilner@bursor.com

**GUCOVSCHI ROZENSHTEYN, PLLC**
Adrian Gucovschi (*pro hac vice* forthcoming)
Benjamin Rozenshteyn (*pro hac vice* forthcoming)
140 Broadway, 46th Floor
New York, New York 10005
Telephone: (212) 884-4230
E-Mail: adrian@gr-firm.com
          ben@gr-firm.com

*Attorneys for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIKRAM SINGH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ADOBE INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>(1) UNFAIR COMPETITION<br>(2) CONVERSION<br>(3) FALSE ADVERTISING<br>(4) VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT<br>(5) UNJUST ENRICHMENT / RESTITUTION<br>(6) NEGLIGENT MISREPRESENTATION<br>(7) FRAUD<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Vikram Singh ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Adobe Inc., ("Adobe" or "Defendant").  Plaintiff makes the following allegations pursuant to the investigation of his counsel and upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## **INTRODUCTION**

1.      This is a putative class action lawsuit against Defendant for engaging in an illegal "automatic renewal" scheme with respect to its subscription plans for Adobe software products and services that are available exclusively to consumers who enroll in Defendant's auto-renewal membership programs (collectively, the "Adobe Subscriptions," enumerated below) through its website at www.adobe.com (the "Adobe Website").  Defendant is a leading industry computer software developer who offers a wide range of document, photo and video editing platforms. Defendant offers paid Adobe Subscriptions that allow consumers to view, make, manage, upload, and share a variety of content useful for students, creative professionals, small businesses, and large enterprises. The Adobe Subscriptions provide consumers with access to a broader range of features than are unavailable through a free membership, including exclusive access to additional tools and features.  Relevant to Plaintiff's allegations, when consumers sign up for the Adobe Subscriptions, Defendant surreptitiously enrolls consumers into a program that automatically renews the Adobe Subscriptions from month-to-month or year-to-year resulting in monthly or annual charges to the consumer's credit card, debit card, or third-party payment account ("Payment Method").  In doing so, Defendant fails to provide the requisite disclosures and authorizations required to be made to California consumers under California's Automatic Renewal Law ("ARL"), Cal. Bus. Prof. Code §§ 17600, *et seq.*

2.      Defendant markets, advertises, and sells paid memberships to the Adobe Subscriptions through the Adobe Website, which include, without limitation, automatic renewal

programs for the following platforms: Creative Cloud All Apps,[1] Acrobat Pro,[2] Photoshop,[3] Illustrator,[4] InDesign,[5] Premiere Pro,[6] After Effects,[7] Lightroom,[8] Animate,[9] Dreamweaver,[10]

---

[1] Creative Cloud All Apps contains Adobe's ultimate toolkit of apps and tools. The membership offers a comprehensive platform that includes twenty of Adobe's most popular tools used to create, edit, share, and view digital content. The membership is mostly intended for creative professionals and cater to a wide range of business and personal needs. The subscription includes free to download apps, namely, Photoshop Express, Character Animator, Capture, Fresco, Bridge, Media Encoder, Aero, Scan, Fill & Sign, and Acrobat Reader. It is offered with a free 7-day trial, followed by an automatically renewing membership for $59.99 per month, $659.88 per year, or $89.99 per month with no annual commitment.

[2] Adobe Acrobat Pro is offered as a part of the Creative Cloud All Apps subscription, or as a standalone subscription.  allows users to create, edit, and manage PDF's, with various tools. The software provides features such as combining, compressing, commenting, signing, and merging PDF's. As a standalone subscription, Adobe Acrobat Pro automatically renews for $19.99 per month with an annual commitment, $239.88 per year, or $29.99 per month with no annual commitment.

[3] Photoshop is offered as a part of the Creative Cloud All Apps subscription, or as a standalone subscription. It provides users with the platform to create, edit and design images with a full suite of unique tools that incorporate AI. Photoshop automatically renews for $19.99 per month with an annual commitment, or $239.88 per year paid upfront.

[4] Illustrator is offered as a part of the Creative Cloud All Apps subscription, or as a standalone subscription.  Illustrator uses AI to provide tools to create logos, package designs, and graphics. The subscription automatically renews for $22.99 per month with an annual commitment, $263.88 per year, or $34.49 per month with no annual commitment.

[5] InDesign is offered as a part of the Creative Cloud All Apps subscription, or as a standalone subscription. It is an app where users can design and publish material in layouts fit to create books, magazines, posters, and various other digital and physical content. The subscription automatically renews for $22.99 per month with an annual commitment, $263.88 per year, or $34.49 per month with no annual commitment.

[6] Adobe Premiere Pro is offered as a part of the Creative Cloud All Apps subscription, or as a standalone subscription. It offers tools for users to edit, trim, and add effects to their videos, among other things. The platform contains hundreds of unique tools powered by AI to create, modify, and customize videos. The subscription automatically renews for $22.99 per month with an annual commitment, $263.88 per year, or $34.49 per month with no annual commitment.

[7] After Effects is included in the Creative Cloud All Apps subscription and as a standalone subscription. It provides users with a platform to create motion graphics, animations, visual effects, and 3D images, amongst other features. The subscription automatically renews for $22.99 per month with an annual commitment, $263.88 per year, or $34.49 per month with no annual commitment.

[8] Lightroom (1TB) is included in the Creative Cloud All Apps subscription and as a standalone subscription. It hosts a platform where users can edit, organize and share photos, with various editing features. The subscription automatically renews for $9.99 per month with an annual commitment, or $119.88 per year with an annual prepaid plan.

[9] Animate is offered as a part of the Creative Cloud All Apps subscription, or as a standalone subscription. It offers design and interactive tools to create animations fit for TV shows, games,

Audition,[11] InCopy,[12] Adobe Express,[13] and Adobe Firefly[14]—collectively, the ("Adobe Subscriptions").

3.      Consumers can sign up for Defendant's Adobe Subscriptions through the Adobe Website.  To do so, consumers provide Defendant with their billing information, and Defendant then automatically charges its customers' Payment Method as payments are due on a monthly or yearly basis. Defendant is then able to unilaterally charge its customers renewal fees without their consent, as it is in possession of its customers' Payment Method.  Thus, Defendant has made the deliberate decision to charge Plaintiff and other similarly situated customers on a recurring basis, relying on consumer confusion and inertia to retain customers, combat consumer churn, and bolster its revenues.

4.      Pursuant to the ARL, online retailers who offer automatically renewing subscriptions to California consumers must: (i) provide the complete automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent prior to

_____

and web. The subscription automatically renews for $22.99 per month with an annual commitment, $263.88 per year, or $34.49 per month with no annual commitment.

[10] Dreamweaver is offered as a part of the Creative Cloud All Apps subscription, or as a standalone subscription. Using Dreamweaver, users can code and set up webpages using templates that are customizable. The subscription automatically renews for $22.99 per month with an annual commitment, $263.88 per year, or $34.49 per month with no annual commitment.

[11] Audition is offered as a part of the Creative Cloud All Apps subscription, or as a standalone subscription. It provides users with the tools to create, mix, and design sound effects with a variety of expert level tools to deliver a variety of different sound content. The subscription automatically renews for $22.99 per month with an annual commitment, $263.88 per year, or $34.49 per month with no annual commitment.

[12] InCopy is offered as part of the Creative Cloud All Apps subscription and also available as a standalone subscription. It is a tool that lets users collaborate with other copywriters and editors on the same document. InCopy allows writers to edit, style text, and track changes simultaneously. The subscription automatically renews for $4.99 per month with an annual commitment, $59.88 per year, or $7.49 per month with no annual commitment.

[13] Adobe Express is a comprehensive toolkit for content creation that includes tools to edit and design content with generative AI. It creates content meant for a variety of different social media platforms. The subscription automatically renews for $9.99 per month with no annual commitment or $99.99 per year.

[14] Adobe Firefly is included in the Creative Cloud All Apps subscription and also available as a standalone subscription. The platform utilizes generative AI to allow users to transform ideas into content that can be edited and shared. The subscription automatically renews for $4.99 per month with no annual commitment or $49.99 per year.

completion of the enrollment process, *see* Cal. Bus. Prof. Code § 17602(a)(1); (ii) obtain consumers' affirmative consent prior to charging their Payment Methods in connection with the subscriptions, *see id*. § 17602(a)(2); and (iii) provide an acknowledgment that includes the automatic renewal offer terms and identifies a cost-effective, timely, and easy-to-use mechanism for consumers to cancel their subscriptions, *see id*. §§ 17602(a)(3), 17602(c).

5.     Consumers who purchase the Adobe Subscriptions do so either by (a) opting into a seven-day free trial which automatically renews as a paid yearly subscription (charged monthly) at the end of the trial period, (b) a paid monthly subscription, or (c) a paid yearly subscription.  As discussed in greater detail below, the enrollment process for Adobe Subscriptions on the Adobe Website uniformly violates each of the core requirements of the ARL. Defendant also makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Adobe Subscriptions.

6.     Specifically, Defendant systematically violates the ARL by: (i) failing to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement is fulfilled, in violation of Section 17602(a)(1); (ii) charging consumers' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Section 17602(a)(2); and (iii) failing to provide an acknowledgment that includes the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in direct violation of Section 17602(a)(3). *See* Cal. Bus. & Prof. Code §§ 17602(a)(1)-(3); *see also id*. § 17601(b)(1)-(5) (setting forth the definition of "automatic renewal offer terms" as used in Cal. Bus. Prof. Code § 17602(a)).  The acknowledgment email also fails to disclose a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation. In fact, Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Adobe Subscriptions, in violation of Section 17602(c) of the ARL.

7.     As a result, Defendant's Adobe Subscriptions are deemed to be "unconditional gifts" under the ARL, entitling Plaintiff and the Class to restitution.  *See* Cal. Bus. & Prof. Code § 17603.

8. For the foregoing reasons, Plaintiff brings this action individually and on behalf of all California subscribers of any of Defendant's Adobe Subscriptions who, within the applicable statute of limitations period up to and including the date of judgment in this action, incurred unauthorized fees for the renewal of their Adobe Subscriptions. Based on Defendant's unlawful conduct, Plaintiff seeks damages, restitution, declaratory relief, injunctive relief, and reasonable attorneys' fees and costs, for: (1) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (2) conversion; (3) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*.; (4) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*.; (5) unjust enrichment/restitution; (6) negligent misrepresentation; and (7) fraud.

## **THE PARTIES**

9. Plaintiff Vikram Singh is a citizen of California, residing in Antioch, California. Plaintiff Singh has been an Adobe subscriber since June of 2022, when he started a free trial of "Creative Cloud All Apps 100GB." At the end of the free trial, Adobe automatically charged him a subscription fee of $29.99 plus tax.[15] Upon noticing the charges to his credit card, Plaintiff Singh attempted to cancel the Adobe subscription. Following the necessary steps to effectuate cancellation through his online Adobe account, Mr. Singh realized that upon the expiration of the free trial, his subscription became an "Annual, paid monthly" Adobe Subscription. By seeking to effectuate the cancellation, Mr. Singh was presented with a sizeable outstanding balance for the remainder of his yearly subscription term. The "Subscription and Cancellation Terms" on Defendant's Website revealed a hyperlink with additional terms that were not conspicuously presented through Mr. Singh's enrollment process. These terms state that to cancel a yearly (paid monthly) Adobe Subscription after 14 days from the first charge requires a consumer to pay 50% of the balance for the remaining months of the Adobe Subscription (*i.e.*, the "Early Termination Fee"). Because 14 days had lapsed since Mr. Singh noticed Defendant's unauthorized charge to his account, Plaintiff Singh opted to proceed with his Adobe Subscription rather than pay Defendant's

---

[15] Upon information and belief, as of June 2022, Defendant's "Creative Cloud All Apps 100GB" subscription was priced at $29.99 plus tax.

hefty Early Termination Fee. In May 2023, Plaintiff Singh successfully canceled his yearly Adobe Subscription by paying a lower Early Termination Fee, which by then amounted to $15.00 plus tax.

10.     As a direct result of Defendant's violations of the ARL as alleged herein, Mr. Singh suffered economic injury. The facts giving rise to Mr. Singh's claims are materially the same as those of the Class he seeks to represent.

11.     Defendant Adobe.com, Inc. ("Adobe" or "Defendant") is a Delaware corporation with its corporate headquarters and principal place of business located at 345 Park Avenue, San Jose, CA 95110.  Founded in 1982 by John Warnock and Charles Geschke, Adobe evolved from a small software startup into a global leader in digital media and marketing solutions. Defendant's business began with a focus on developing PostScript[16] page description language. Following its initial success, Adobe quickly expanded its portfolio to include groundbreaking software such as Adobe Illustrator and Adobe Photoshop which revolutionized digital design and image editing. Over the years, Adobe has continued to grow its software offerings by introducing products like Adobe Acrobat, Adobe Flash, and the Adobe Creative Suite. In 2012, Adobe made a significant shift from offering free access to its products to a subscription-based business model coined the Adobe Creative Cloud—a software platform providing consumers with a comprehensive suite of exclusive creative editing tools. Today, Adobe Creative Cloud has led Defendant to attain a virtual monopoly in the industry.  As of the first quarter of 2024, Adobe is the leading application development company in the United States, with an estimated market share of nearly 61%.[17]

12.     Defendant offers access to certain exclusive content, products, and/or services on a contract or fee basis to customers who enroll in the automatically renewing Adobe Subscriptions.

---

[16] PostScript is a page description language (PDL) developed by Adobe Systems in 1982. It is primarily used in the electronic and desktop publishing areas for defining the layout and appearance of documents. PostScript files can be created by various programs and then interpreted by PostScript interpreters to render the documents accurately on different output devices, such as printers and displays. https://www.adobe.com/products/postscript/pdfs/PLRM.pdf (last accessed June 20, 2024).

[17] https://6sense.com/tech/application-development/adobe-market-share (last accessed June 20, 2024).

Defendant owns and operates the Adobe Subscriptions, which it markets to consumers through its Website. Defendant is responsible for the promotion, advertisement, and/or marketing of the Adobe Subscriptions, and it owns and operates the Adobe Website. Defendant sells – and, at all times during the Class Period, sold – the Adobe Subscriptions in California and has done business throughout California and the United States.

13.    Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, and/or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims for all members of the proposed class are in excess of $5,000,000.00, exclusive of interests and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, is a citizen of a state different from Defendant.

15.    This Court has personal jurisdiction over the parties because Plaintiff resides in California, is a citizen of California, and submits to the jurisdiction of the Court, and because Defendant has, at all times relevant hereto, systematically and continually conducted, and continues to conduct, business in California, including within this District.  Defendant therefore has sufficient minimum contacts with this state, including within this District and/or intentionally availed itself of the benefits and privileges of the California consumer market through the promotion, marketing, and sale of its products and/or services to residents within this District and throughout California. Additionally, Defendant is headquartered in this District and it marketed and sold the Adobe Subscription to Plaintiff in this District.

16.    Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.  Also, Plaintiff resides in this District and purchased Defendant's Adobe Subscription in this District.  Moreover, Defendant systematically conducts business in this District and

throughout the State of California, and it distributed, advertised, and sold the Adobe Subscriptions to Plaintiff and Class Members in this State and District.

## **FACTUAL BACKGROUND**

A.      **Background On The Subscription e-Commerce Industry**

17.      The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[18]  Subscription e-commerce services now target a wide range of customers and cater to a variety of specific interests.  Given the prevalence of online and e-commerce retailers, subscription e-commerce has grown rapidly in popularity in recent years.  Indeed, the "subscription economy has grown more than 400% over the last 8.5 years as consumers have demonstrated a growing preference for access to subscription services[.]"[19]  Analysts at UBS predict that the subscription economy will expand into a $1.5 trillion market by 2025, up from $650 billion in 2020.[20]  That constitutes an average

---

[18] Core DNA, *How to Run an eCommerce Subscription Service: The Ultimate Guide* (May 19, 2020), https://www.coredna.com/blogs/ecommerce-subscription-services.

[19] Business Insider, *Taco Bell's taco subscription is rolling out nationwide — here's how to get it* (Jan. 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

[20] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html ("[A]t close to USD 650 billion in 2020, we expect the subscription economy to expand into a USD 1.5 trillion market by 2025, implying an average annual growth rate of 18%.").

*See also* Subscribed, *UBS Declares: It's Worth Investing in the Subscription Economy* (Apr. 17, 2021), https://www.subscribed.com/read/news-and-editorial/ubs-declares-its-worth-investing-in-the-subscription-economy; Business 2 Community, *The Subscription Economy Is Booming Right Now. But Are You Reaping the Full Benefits?* (Oct. 7, 2021), https://www.business2community.com/ecommerce/the-subscription-economy-is-booming-right-now-but-are-you-reaping-the-full-benefits-02434851.

annual growth rate of 18%, which makes the subscription economy "one of the fastest-growing industries globally."[21]

18.     The production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity over the past few years.  According to *Forbes*, "[t]he subscription e-commerce market has grown by more than 100% percent a year over the past five years, with the largest retailers generating more than $2.6B in sales in 2016, up from $57.0M in 2011."[22]  Following 2016, market growth within the industry increased exponentially, reaching $650 billion in 2020.[23]  "As such, the financials of companies with subscription business models[] … improved dramatically in 2020 thanks to limited revenue volatility and strong cash flow generation."[24]  Thus, "[t]he share prices of most subscription companies have performed well in recent years."[25]

19.     The expansion of the subscription e-commerce market shows no signs of slowing. "We're now in the subscriptions era, and the pandemic is accelerating its takeover.  During the COVID-19 lockdowns, many digital-based subscription business models fared well due to their promise of convenience and strong business continuity."[26]  According to *The Washington Post*, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] … The subscription economy was on the rise before the

---

[21] UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *supra* ("[Growth] was seen across many areas, including e-commerce, video streaming, gaming, cloud-based applications, etc."); *see also* Juniper Research, *Subscriptions For Physical Goods To Overtake Digital Subscriptions By 2025; Growing To Over $263bn Globally* (Oct. 12, 2020), https://www.juniperresearch.com/press/subscriptions-for-physical-goods-to-overtake (acknowledging "the significant lead the digital sector has had in th[e] area[ of digital service subscriptions]").

[22] Forbes, *The State Of The Subscription Economy, 2018* (Mar. 4, 2018), https://www.forbes.com/sites/louiscolumbus/2018/03/04/the-state-of-the-subscription-economy-2018/#6ad8251a53ef.

[23] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *supra*.

[24] *Id.*

[25] *Id.*

[26] *Id.*

pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[27]

20.     However, as *The Washington Post* has noted, there are downsides associated with the subscription-based business model.[28]  While the subscription e-commerce market has low barriers and is thus easy to enter, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[29]  In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[30]  Yet, retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[31]  As these companies have realized, "[t]he real money is in the inertia."[32]  As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[33]  That is, to facilitate consumer inertia, a number of subscription e-

---

[27] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ (noting that "e-commerce and entertainment subscriptions to sites such as Netflix, Hulu and Disney Plus made headlines during the pandemic for soaring growth").

[28] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[29] McKinsey & Company, *Thinking inside the subscription box: New research on e-commerce consumers* (Feb. 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

[30] *Id.*

[31] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[32] *Id.*

[33] Business Insider, *A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want* (Jun. 25, 2019), https://www.businessinsider.com/dark-patterns-online-shopping-princeton-2019-6.

commerce companies, including Defendant, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans.  They do this by intentionally confusing users with the design and flow of their Website and Apps, *e.g.*, by making promises of 'free trials' that convert after only a matter of days, and other misleading tactics," such as failure to fully disclose the terms of its automatic renewal programs.[34]

21.    To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[35]  Moreover, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[36] For instance, numerous companies, including Defendant, have resorted to using "dark patterns" on their e-commerce platforms.  A dark pattern is "a user interface carefully crafted to trick users into doing things they might not otherwise do, such as … signing up for recurring bills."[37]  Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for companies to trap consumers into monthly subscriptions that drain their bank accounts[ and] attempting to respond to a proliferation of abuses by some companies over the past few years[,]"[38] widespread utilization of misleading dark patterns and deliberate omissions persist.

---

[34] TechCrunch, *Sneaky subscriptions are plaguing the App Store* (Oct. 15, 2018), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.

[35] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), *supra* ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); *see also* New Media and Marketing, *The problem with subscription marketing* (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing/.

[36] *Id.*

[37] UX Design, *Dark patterns in UX: how designers should be responsible for their actions* (Apr. 15, 2018), https://uxdesign.cc/dark-patterns-in-ux-design-7009a83b233c (quoting UX designer Harry Brignull (PhD Cognitive Science), who coined the term "Dark Patters" in August 2010).

[38] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), *supra.*

22.     Adobe successfully capitalized on this demand by transitioning from selling physical software to using a 'software as a service' model ("SaaS"). Whereas before Adobe took approximately 18 months to develop products that cost between $1,300 to $2,600, now, Adobe offers its products for as little as $4.99 to $29.99 per month, thus enabling it to grow rapidly. In 2023, Defendant reported that recurring revenue grew 12% over the preceding year, leading analysts to estimate that over 33 million subscribers used Defendant's services.[39]

### B.     Defendant's Dark Patterns And Online Consumer Complaints About the Adobe Subscriptions

23.     Defendant's recent growth in revenue and subscriber count with respect to its Adobe Subscriptions coincides with a sharp decline in subscriber satisfaction as the Adobe Subscriptions and the platforms from which they operate have become riddled with "dark patterns." Specifically, Defendant has used various types of dark patterns, including but not limited to "Roach Motel,"[40] "Misdirection,"[41] and "Forced Continuity," [42] in order to prevent users from canceling their Adobe Subscriptions by way of adopting complex cancellation procedures to increase the friction in the subscription cancellation process. Defendant's utilization of these dark patterns – especially in conjunction with its failure to fully disclose the terms of its automatic-

---

[39] *See* Adobe, *Adobe Reports Record Q4 and Fiscal 2023 Revenue* (Dec. 13, 2023), https://news.adobe.com/news/news-details/2023/Adobe-Reports-Record-Q4-and-Fiscal-2023-Revenue/default.aspx?clickref=1100lyrPPXgX&mv=affiliate&mv2=pz&as_camptype=&as_channel=affiliate&as_source=partnerize&as_campaign=prodesigntools; *See also* Pro Design Tools, *Adobe Creative Cloud Adoption Grows to 33 Million Paid Members*, (Jan. 23, 2023), https://prodesigntools.com/number-of-creative-cloud-subscribers.html. (last accessed May 13, 2024).

[40] "Roach Motel" refers to a "design [that] makes it very easy for [consumers] to get into a certain situation, but then makes it hard for [consumers] to get out of it (e.g. a subscription)." https://www.darkpatterns.org/types-of-dark-pattern/roach-motel.

[41] "Misdirection" is a type of dark pattern where a website's "design purposefully focuses [customers'] attention on one thing in order to distract [them] attention from another." In many cases, "[w]hat's deceptive is the way [the website] presents [purchase] options: it uses misdirection to hide what is actually happening[.]" https://www.darkpatterns.org/types-of-dark-pattern/misdirection.

[42] One example of "Forced Continuity," another type of dark pattern, is where customers' sign up for a "free trial with a service[ that] comes to an end and [their] credit card silently starts getting charged without any warning. [The subscriber is] are then not given an easy way to cancel the automatic renewal." https://www.darkpatterns.org/types-of-dark-pattern/forced-continuity.

renewal programs (discussed further below) – has led to a reduction in churn rates by making it next to impossible for subscribers to cancel their Adobe Subscriptions. It has further led to an increase in accidental or unintentional sign-ups by consumers for paid Adobe Subscriptions, in effect increasing subscriber count and, thus, Defendant's overall revenues from renewal fees.[43]

24.     Defendant's use of dark patterns is so egregious that the company's practices earned it a spot on the Deceptive Patterns' "Hall of Shame".[44] One of the threads pinned by Deceptive Patterns on Twitter delineates "[h]ow Adobe tricks users into a 12 month contract."[45] Although the Twitter thread illustrates the dark patterns evident as of February 2022, little has been rectified since. If anything, the Adobe Subscription signup interface has only become more cluttered and deceptive, as outlined in greater detail below.

25.     In fact, the Federal Trade Commission recently filed a complaint against Defendant for various deceptive practices in its enrollment process, including the deceptive design of the checkout page of its Website, the Early Termination Fee, and the difficult cancellation mechanism—overlapping with the issues challenged in this action.[46]

26.     Defendant continues to employ these deceptive tactics to lure consumers into enrolling and remaining enrolled, in paid Adobe Subscription programs. Defendant's conduct has drawn the attention and ire of customers across the country, with countless angry customers taking to the Internet to voice their discontent over Defendant's deceitful tactics.

---

[43] *See* Gizmodo, *Pervasive 'Dark Patterns' Are Fooling People Into Signing Up for Services They Don't Want* (Sep. 15, 2022), https://gizmodo.com/dark-patterns-ui-cancel-subscription-1849542166 ("As much as you think you have full control of you and your wallet, it's getting increasingly difficult for anybody using an app or a website to avoid getting suckered into surrendering your money or personal information to misleading or tricky UI design. … Tech companies and online retailers [] lure users into signing up for subscription services while obscuring costs or charges, then making it difficult to actually cancel.  Some dark patterns include confusing users in dense terms of service to obscure key limitations of products or junk fees attached to their use.")

[44] *See* https://www.deceptive.design/brands/adobe (last accessed June 20, 2024).

[45] *See* https://twitter.com/darkpatterns/status/1489901640777973768 (last accessed June 20, 2024).

[46] www.ftc.gov/news-events/news/press-releases/2024/06/ftc-takes-action-against-adobe-executives-hiding-fees-preventing-consumers-easily-cancelling

27.     For instance, numerous subscribers have left scathing reviews on the Better Business Bureau website, complaining of confusion regarding obscured or undisclosed subscription terms, such as Defendant's unclear free trials, billing practices and the confusing cancellation policy associated with the Adobe Subscriptions.[47]

 **Initial Complaint**
03/07/2024

**Complaint Type:** Product Issues
**Status:** Answered ?

I am writing to express my dissatisfaction with the Adobe Acrobat Pro subscription process and to request an immediate refund and cancellation of my plan.On February 1, 2024, I signed up for a free 7-day trial of Acrobat Pro. The impression given by your company was that at the end of the trial, I would be billed $19.99 per month to continue using the product. However, I was not reminded to cancel my trial, and I was completely unaware of any upcoming charges, as I did not use the product at all during the trial period.Upon attempting to cancel my service, I was shocked to discover that I had been subscribed to approximately 20 Adobe products without my consent, and that my monthly fee was actually part of a yearly fee, for which I was paying in installments. This was not made explicit at the time of sign-up; the terms suggested that this was a monthly service bill, not an annual subscription.Furthermore, Adobe had the audacity to charge me an early cancellation fee of $99.95. This is unacceptable, as the terms of the subscription were not clear, and the plan was falsely advertised as a monthly subscription. Additionally, I was not provided with any reminders to cancel the trial before being charged.I demand the immediate cancellation of my plan and a full refund for the payments I have made due to these misleading practices. If my request is not promptly addressed, I will have no choice but to pursue legal action.I expect a swift response and resolution to this matter.

 **Initial Complaint**
03/06/2024

**Complaint Type:** Service or Repair Issues
**Status:** Resolved ?

I took a free trial with Adobe **** and now I cannot cancel it. I have been trying non stop and there is no way to do it via phone, email, or website. It seems like a scam. I want my Refund. This is not what I signed up for. I want the constant payments to end. It is a nonstop payment on my PayPal account but I cannot cancel. Extremely frustrating

 **Initial Complaint**
03/01/2024

**Complaint Type:** Billing Issues
**Status:** Resolved ?

I have tried to cancel my adobe subscription three times and they are refusing to let me cancel. The first time, I tried to cancel during my trial period but apparently was unsuccessful. I asked to cancel it a few months ago, and apparently they did not. Now I am asking to cancel again and they are demanding I pay more money (?). I believe this is deceptive and unfair practices, and should be reported to the Attorney General. They should not make it this difficult to cancel.Although I would prefer a partial refund of the many months I have paid for services I have not used, I at least want to cancel my current subscription now without penalty.

---

[47] https://www.bbb.org/us/ny/new-york/profile/digital-media/Adobe-0121-87150174/customer-reviews



**Initial Complaint**                    **Complaint Type:** Order Issues
02/28/2024                               **Status:** Resolved ?

Deceptive Practices: When I signed up for the 7 day free trial there was no indication that if I failed to cancel in time I would be locked in to a annual contract. After being billed for the first month, I tried to cancel and they would only cancel my membership with a $130.00 cancellation fee. I did not want to keep the membership and didn't want to keep paying $25 a month for another 11 months, so I just cancelled. I feel like Adobe does not put that information clearly displayed when you sign up for a free trial. It is very deceptive.

**Initial Complaint**                    **Complaint Type:** Billing Issues
02/22/2024                               **Status:** Answered ?

I have had a subscription for Adobe Illustrator and canceled it because I am sick of paying for software that constantly crashes my entire computer. I canceled this and paid the $20.99 cancellation fee and have the cancellation confirmation email. Then today they just took out the $22.72 monthly charge again!!! This is THEFT AND FRAUD. I am filing complaints with the *** and ***** Attorney General also, because this is the second account they have done this to me on. I am filing a dispute with my bank and stopping payment in order to recover funds, but I want them to COMPLETELY CANCEL THIS ACCOUNT like they said they already did. This company needs to be closed down and banned from operating in ******* since they choose to behave as criminals. This is illegal behavior and I want this completely and forever canceled. I can send a copy of the email proving I canceled and they confirmed it, but they are now committing actual CRIMINAL THEFT and stealing unauthorized money from my account. They need to be in jail.



**Initial Complaint**                    **Complaint Type:** Billing Issues
02/22/2024                               **Status:** Answered ?

I opted in for the free 7 day tried to see if the pro software could help me edit a few papers. It turns out it couldnt, but I had to put my credit card on file in order to move forward for the free 7 day trial. Now five moths later after paying the $21.64 monthly for months. I now have a penalty for canceling what started off as a free trial. I feel this is very deceptional practice for a TOP tier software company. I would expect something like this from a *************** and not an American software company. I would like the $64.92 which is currently planned to charge my card for canceling, to be refunded to me. If you look I never end up using the software because Adobe couldn't match the font I needed. I was completely disappoint that a pro software package from a *************** couldn't match a simple font. Going forward I will avoid this company like the plague!!

1       28.     Other subscribers to the Adobe Subscriptions left similar complaints on the Trust

2   Pilot's website:[48]



**Bait and switch scam offering a low…**

Bait and switch scam offering a low monthly rate and then tying you in to an annual commitment even though this is never mentioned in the offer or in the fine print. Both state monthly fee but fail to mention annual commitment! Total SCAM! How can such a large business have such shady business practices?

Date of experience: April 08, 2024

7 days ago



**Immoral Company Practices**

Very unhappy with the marketing of this company. I signed on to a free trial thinking that it was only a monthly subsciption i had agreed to. But the company had structured the agreement so that I was actually locked into a FULL YEAR contract with them, and was obliged to see it through. Only after contacting them and making my case for hours with them did they reluctantly give me my money back. I will not use this product or work with this company unless absolutely necessary. Best to stay away if you can.

Date of experience: April 09, 2024

6 days ago



**Predatory and deceptive free trial…**

Predatory and deceptive free trial offers. Adobe sets it up so that the default free-trial option is a monthly payment plan after the trial. However, what they don't make clear enough, is that it's a monthly payment for a "yearly contract" which results in a large early termination fee if you cancel even after just 1 month.

Very poor value for what you pay for. Why innovate when you can just scam?

Date of experience: March 03, 2024

Apr 4, 2024

**Total scam**

Total scam. How on earth do they justify sneaking a huge cancellation fee into the small print for a software sign up! It's exactly companies like this that make you wary of signing up for a free trial. What ever you do don't forget to cancel it by the end of the week or they'll stiff you for a hundred odd quid. Robbers.

Date of experience: March 29, 2024

Mar 29, 2024

---

[48] https://www.trustpilot.com/review/www.Adobe.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Apr 5, 2024

**Scammers**

Scammers, You will get stuck in a yearly monthly subscription, promoting a free month trial

Date of experience: April 05, 2024



Updated Mar 20, 2024

**Scam artists**

They give you a trial period of 14 days, if you forget to cancel, you are locked into a year contract where you have to pay a 50% cancellation fee for the rest of the year's subscription. The reason they say is because it's discounted, but I fail to see how that fits into the equation.

I'm just surprised that such a big name corporation like Adobe can use scam tactics like this.
Adobe should start looking at the amount of negative reviews they have received in regards to this scam marketing tactic before trying to write any serious reply to these reviews.

Date of experience: March 19, 2024



Mar 14, 2024

**Beware - Subscription Trap!**

Like many other reviews, we signed up for temporary use and at no point was 'Annual Subscription - paid monthly' made in any way clear, only cited as £XX.xx per month, which to any reasonable person implies a Monthly subscription.

This is a well known tactic known as a 'Subscription Trap', where the true terms are buried in lengthy T&Cs.

Quoted the 50% cancellation fee, I feel this is ridiculous. I don't know how Adobe get away with this. Be warned.

Date of experience: March 14, 2024



Mar 11, 2024

**Same experience as below- free trial…**

Same experience as below- free trial converted to a one year subscription which is not able to be canceled without a huge cancellation fee. When I chatted with their support they tried to offer me another extension at a low price, said if I didn't want it, I could get my money back - with no mention again of a cancellation fee. This is definitely horrible customer service- it's like a bait and switch scam. Stay away!!!!

Date of experience: March 11, 2024

29.     The above reviews are just a sampling of numerous negative reviews consumers have left regarding Defendant's Adobe Subscriptions and the unclear cancellation policies and confusing billing associated with the Subscriptions.  As discussed below, the above online consumer complaints reveal a widespread pattern of uniform unlawful conduct by Defendant, underscoring the artifice devised and employed by Defendant to lure and deceive millions of consumers into enrolling, and remaining enrolled, in their paid Adobe Subscription programs.

**C.     California's Automatic Renewal Law**

30.     In 2010, the California Legislature enacted the Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq*., with the intent to "end the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service."  Cal. Bus. & Prof. Code § 17600 (statement of legislative intent).  More recently, in 2018, California's Senate Bill 313 amended Section 17602 of the ARL, adding new requirements meant to increase consumer protections for, among other things, orders that contain free trial and promotional pricing, and subscription agreements entered into online.  The California Legislature again amended the ARL in 2022, adding additional notice, disclosure, and cancellation requirements.  *See* Cal. Bus. & Prof. Code §§ 17602(a)(4)(A)-(E), 17602(b)(1)-(2), 17602(d)(1)-(3).

31.     The ARL makes it "unlawful for any business making an automatic renewal or continuous service offer to a consumer in this state to do any of the following:"

> (1)  Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer.  If the offer also includes a free gift or trial, the offer shall include a clear and conspicuous explanation of the price that will be charged after the trial ends or the manner in which the subscription or purchasing agreement pricing will change upon conclusion of the trial.

> (2)  Charge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic

renewal offer or continuous service offer that is made at a
promotional or discounted price for a limited period of time.

(3)  Fail to provide an acknowledgment that includes the automatic
renewal offer terms or continuous service offer terms, cancellation
policy, and information regarding how to cancel in a manner that is
capable of being retained by the consumer.  If the automatic renewal
offer or continuous service offer includes a free gift or trial, the
business shall also disclose in the acknowledgment how to cancel,
and allow the consumer to cancel, the automatic renewal or
continuous service before the consumer pays for the goods or
services.

Cal. Bus. & Prof. Code § 17602(a)(1)-(3).

32.     As of 2018, the updated ARL also requires that, prior to the completion of the initial

order for the automatic renewal or continuous service, sellers must explain the price to be charged

when the promotion or free trial ends.  *See* Cal. Bus. & Prof. Code § 17602(a)(1), *supra*.  If the

initial offer is at a promotional price that is only for a limited time and will increase later, the seller

must obtain consumer consent to the non-discounted price prior to billing.  *See id*.  Sellers must

also notify consumers in the acknowledgment about how to cancel the free trial before they are

charged.  *See* Cal. Bus. & Prof. Code § 17602(a)(3), *supra*.

33.     Section 17602(c) of the ARL further provides:

A business that makes an automatic renewal offer or continuous
service offer **shall provide a toll-free telephone number, electronic
mail address**, a postal address if the seller directly bills the
consumer, **or it shall provide another cost-effective, timely, and
easy-to-use mechanism for cancellation** that shall be described in
the acknowledgment specified in paragraph (3) of subdivision (a).

Cal. Bus. & Prof. Code § 17602(c). (emphasis added).

34.     Additionally, following the 2018 and 2022 amendments to the ARL, the updated

law also requires e-commerce sellers, doing business in California, to allow online cancellation of

auto-renewing memberships or recurring purchases that were initiated online.  Specifically,

Section 17602(d) provides:

[A] business that allows a consumer to accept an automatic renewal
or continuous service offer online shall allow a consumer to
terminate the automatic renewal or continuous service *exclusively
online*, *at will*, *and without engaging any further steps that obstruct*

*or delay the consumer's ability to terminate the automatic renewal or continuous service immediately*.

Cal. Bus. & Prof. Code § 17602(d)(1) (emphasis added).

35.    The updated ARL further specifies that a seller who provides an automatic offer "shall provide a method of termination that is online in the form of either of the following: (A) A prominently located direct link or button which may be located within either a customer account or profile, or within either device or user settings[; or] (B) By an immediately accessible termination email formatted and provided by the business that a consumer can send to the business without additional information." Cal. Bus. & Prof. Code § 17602(d)(1)(A)-(B).

36.    Section 17601(a) of the ARL defines the term "Automatic renewal" as a "plan or arrangement in which a paid subscription or purchasing agreement is automatically renewed at the end of a definite term for a subsequent term." Cal. Bus. & Prof. Code § 17601(a).

37.    Section 17601(b) of the ARL defines the term "Automatic renewal offer terms" as "the following clear and conspicuous disclosures: (1) That the subscription or purchasing agreement will continue until the consumer cancels. (2) The description of the cancellation policy that applies to the offer. (3) The recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known. (4) The length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer. (5) The minimum purchase obligation, if any." Cal. Bus. & Prof. Code § 17601(b).

38.    Pursuant to Section 17601(c) of the ARL, "clear and conspicuous" or "clearly and conspicuously" means "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbol ls or other marks, in a manner that clearly calls attention to the language." Cal. Bus. & Prof. Code § 17601(c).

39.    Finally, Section 17603 of the ARL provides that where a "business sends any goods, wares, merchandise, or products to a consumer, under a continuous service agreement or

automatic renewal of a purchase, without first obtaining the consumer's affirmative consent[,]" the material sent will be deemed "an unconditional gift to the consumer, who may use or dispose of the same in any manner he or she sees fit without any obligation whatsoever on the consumer's part to the business[.]" Cal. Bus. & Prof. Code § 17603.

40.     As alleged below, Defendant's practices on the Adobe Website systematically violates Sections 17602(a)(l), 17602(a)(2), 17602(a)(3), 17602(c), and 17602(d) of the ARL.

**D.     Defendant's Business: The Adobe Subscription Enrollment Process**

41.     At all relevant times, Defendant offered, via the Adobe Website, the Adobe Subscriptions for access to exclusive Adobe content, products, and/or services on a contract or fee basis.  The Adobe Subscriptions are offered on a recurring basis for "Annual, paid monthly," "Annual, prepaid," or "Monthly" terms, and all plans automatically renew at the end of the defined renewal term unless the subscriber cancels. The enrollment process for all of the Adobe Subscriptions is substantially the same.

42.     By way of example, when a consumer signs up for the Adobe Creative Cloud All Apps Subscription and ***fails to opt out of the preselected*** "Annual, paid monthly" plan, after the initial free trial, their Adobe Subscriptions are automatically renewed and their Payment Methods are charged the full standard recurring amount associated with that Adobe Subscription, currently "US$59.99/mo" (exclusive of tax), for the next month, and every month thereafter if they do not cancel (canceling within the first year requires paying a sizeable "Cancellation Fee," described in greater detail below).  Likewise, when customers sign up for the "Annual, prepaid" Adobe Creative Cloud All Apps Subscription, after the initial one-year renewal term, their subscriptions are automatically renewed, and their Payment Methods are charged the full standard recurring amount associated with the given Adobe Creative Cloud All Apps Subscription, currently "US$659.88/yr" (exclusive of tax), for the next year, and every year thereafter if they do not cancel.  Finally, when customers sign up for the "Monthly" Adobe Creative Cloud All Apps Subscription, after the initial month, their subscriptions are automatically renewed and their Payment Methods are charged the full standard recurring amount associated with Adobe Creative Cloud All Apps Subscription, currently "US$89.99/mo" (exclusive of tax), for the next month, and

every month thereafter if they do not cancel. Defendant's Adobe Subscriptions constitute automatic renewal and/or continuous service plans or arrangements for the purposes of Cal. Bus. & Prof. Code § 17601.

43.     Consumers can sign up for Defendant's Adobe Subscription plans through the Adobe Website.  Defendant automatically enrolls customers who purchase an Adobe Subscription via the Adobe Website in their chosen Adobe Subscription program going forward, by default.  In addition, customers may sign up for several of the Adobe Subscriptions on a free-trial and/or promotional basis (*i.e.*, at a discounted renewal rate), for a limited time.  Nevertheless, customers that enroll in a free trial or a discounted rate plan must provide Defendant their payment information at the time of enrollment. Customers' free trial subscriptions automatically convert to paid yearly or monthly subscriptions at the end of the trial period, at which point those users are also automatically enrolled by Defendant into a paid Adobe Subscription program, and as such their Payment Methods are automatically charged by Defendant on a recurring yearly or monthly basis in the amount of the full rate associated with that program, continuing indefinitely until the customer takes affirmative steps to cancel.

44.     The enrollment processes for all of the Adobe Subscriptions is substantially the same. Upon navigating to Defendant's Website, prospective customers are greeted with a centered and contrasting "Free trial" button on the homepage of the Website. The adjacent "See all plans" link[49] is underlined, yet otherwise overshadowed by the "Free trial" button. Screenshots of Defendant's Website are added below by way of illustration, (boxes and arrows added for emphasis):

---

[49] The "See all plans" link takes prospective customers to a page that contains the available standalone applications, bundles, their respective pricing and a variety of associated offers. *See* https://www.adobe.com/creativecloud/plans.html (last accessed June 20, 2024).



45.    Pressing the "Free trial" button opens a lightbox with confusing payment plans for the "Creative Cloud All Apps":



46.    The lightbox is titled "**Try the full version of Adobe apps with a 7-day free trial**." The column on the right outlines the options for obtaining the "Creative Cloud All Apps" – the "Annual, paid monthly" for "US$59.99/mo," the "Annual, prepaid" for "US$659.88/yr," and the "Monthly" for "US$89.99/mo." Notably, the "Annual, paid monthly" is automatically

preselected upon opening the lightbox with the offer terms. This is done by design, as evidenced by the preselection of the offer, as well as the distinct prominence of the larger and bolded font of the conspicuously lower price (compared to the alternative offers). As such, Defendant purposely steers consumers into an "Annual, paid monthly" Adobe Subscription.

47.     After selecting their payment plan for the Adobe Subscriptions and clicking "Continue," consumers are prompted to input their email address or log into their existing Adobe accounts.  After these steps, consumers are directed to the final webpage of the enrollment process (the "Checkout Page") where prospective subscribers are prompted to input their payment information and are then invited to complete their purchase by selecting the blue button at the bottom of the webpage.  For the purposes of the ARL and this Complaint, the "relevant portion of the Checkout Page" refers to the text of that portion of the Checkout Page that appears "in visual proximity to the request for consent to the offer," which in this case pertains to text nearby the final blue button at the bottom of the Checkout Page that customers must click in order to complete the checkout process.

48.     By way of example, when a consumer signs up for a "Yearly billed monthly" Creative Cloud All Apps on a free trial basis, the "relevant portion of the Checkout Page" refers to the disclosures contained in the block of gray text immediately above the blue "Agree and subscribe" checkout button at the bottom of the page (*i.e.*, the "request for consent"), which contains the following language and appearance (red box added for emphasis):



If a consumer chooses to scroll down, the Checkout Page's design changes in appearance, (red box added for emphasis):



49.      The layout and text of the Checkout Page for each of the paid Adobe Subscriptions is aesthetically and functionally similar to the Checkout Page for the above-illustrated Creative Cloud All Apps Adobe Subscription.  In all cases, the relevant portion of the Checkout Page fails

to adequately disclose the automatic renewal terms associated with Defendant's Adobe Subscriptions in the manner required by law.

50.     Regardless of how the consumer subscribes (via the Adobe Website, on either its desktop or mobile format), and irrespective of which Adobe Subscription program or which specific plan the subscriber selects (whether "Monthly," "Yearly, billed monthly," or "Yearly, billed upfront"), Defendant fails to disclose the full terms of its auto-renewal programs either before or after checkout, and it never requires the individual consumer to read or affirmatively agree to any terms of service, *i.e.*, by requiring consumers to click a checkbox next to the automatic renewal offer terms before consumers complete the checkout process and submit their orders for their Adobe Subscriptions. Consequently, Defendant uniformly fails to obtain any form of consent from – or even provide effective notice to – their subscribers before charging consumers' Payment Methods on a recurring basis.

**E.     Defendant Violates California's Automatic Renewal Law**

51.     At all relevant times, Defendant failed to comply with the ARL in three ways: (i) Defendant failed to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement was fulfilled, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (ii) Defendant charged Plaintiff's and Class members' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and (iii) Defendant failed to provide an acknowledgment that included the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(3).  Defendant also fails to provide an acknowledgment that discloses a toll-free telephone number or describes another cost-effective, timely, and easy-to-use mechanism for cancellation, and, in fact, Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Adobe Subscriptions, in violation of Cal. Bus. & Prof. Code §§ 17602(c) and 17602(d).

1

2

3

       **i.**     **Defendant Fails To Clearly And Conspicuously Present The Adobe Subscription Terms Before The Subscription Agreement Is Fulfilled And In Visual Proximity To The Request For Consent To The Offer.**

4

       52.     As an initial threshold, the relevant portion of the Checkout Page containing the

5

purported automatic renewal offer terms is not "clear and conspicuous" as required under the

6

statute. *See* Cal. Bus. & Prof. Code § 17601(c).  As illustrated by the Checkout Pages above, this

7

information is presented in minuscule, grey font (8.5 point to be exact) without emphasis or

8

distinction—making it eligible to the naked eye. Furthermore, the block of text is provided in a

9

*smaller* size text as compared to most other text of the Checkout Page.  Indeed, much of the other

10

text of the Checkout Page is significantly larger and, in effect, more visually prominent than any

11

disclosures contained in this block of text adjacent to the blue "Agree and subscribe" button, which

12

renders this tiny text in the relevant portion of the Checkout Page considerably less conspicuous by

13

comparison and ultimately distracts the eye away from such small text and towards the larger text

14

featured on the majority of the Checkout Page.  In other words, the disclosure was presented in

15

such a way that it could be, and was, easily overlooked, and is therefore not "clear and

16

conspicuous" as defined by the ARL. *See* Cal. Bus. & Prof. Code § 17601(c).[50]

17

_____

18

[50] Based on these features, this block of text placed near the bottom of the Checkout Page and all statements and disclosures buried therein constitute "fine print."  *See Fine Print*, Black's Law

19

Dictionary (9th ed. 2009) (defining "fine print" as "[t]he part of an agreement or document—usu. in small, light print that is not easily noticeable—referring to disclaimers, restrictions, or

20

limitations."); *see also Fine Print*, The Law Dictionary, *available at* https://thelawdictionary.org/fine-print/ (defining "Fine Print" as "[a] small type size that contracts

21

and policy are sometimes printed in" and noting that "[t]he print is small as it relates to rules, deductions, exlusions, and reductions of a policy" and that "[i]t is smaller print than the main part

22

of the document").  **That it is exactly the type of deceptive practice that the California Legislature sought to deter and penalize when it enacted the ARL**.  *See Turnier v. Bed Bath &*

23

*Beyond Inc.*, 517 F. Supp. 3d 1132, 1140 n.6 (S.D. Cal. 2021) (ARL Case) ("Notably, the practice that led to ARL was the inclusion of autorenewal terms in fine print."); *see also Berman v.*

24

*Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022) ("Website users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual

25

terms—will be prominently displayed, not buried in fine print.  Because 'online providers have complete control over the design of their websites,' 'the onus must be on website owners to put

26

users on notice of the terms to which they wish to bind consumers.") (internal citations omitted).

27

As a result, any disclosures contained within the relevant portion of Defendant's Checkout Pages –

28

53.     Furthermore, the Checkout Page for the Adobe Subscriptions does not present the complete "automatic renewal offer terms[,]" as defined by Cal. Bus. & Prof. Code § 17601(b), in violation of Section 17602(a)(1) of the ARL.  First, the Checkout Page does not clearly and conspicuously disclose that "the subscription or purchasing agreement will continue until the consumer cancels."  Cal. Bus. & Prof. Code § 17601(b)(1).  As illustrated by the Checkout Page above, although the relevant portion mentions that consumers' "subscriptions will automatically renew monthly until [they] cancel" or that they can "[c]ancel before [their] trial ends,"[51] *see supra* ¶ 48, it is unclear when, exactly, consumers must cancel by and how that cancellation affects the continuation of their Adobe Subscriptions. Specifically, the relevant portion of the Checkout Page states that consumers may [c]ancel anytime via [their] Adobe Account," this information is contradicted by the following sentence which states that consumers must "[c]ancel before Jul 10, 2024 to get a full refund and avoid a fee." *Id.* Based on this information, it is unclear whether consumers may actually "cancel anytime" or whether they must do so by a specific date. Furthermore, because the relevant portion of the Checkout Page does not indicate when consumers' "trial ends," as discussed in greater detail *infra*, the most sensible interpretation of the text suggests that the paid subscription may be canceled "anytime" while the "trial" must be

---

which bury incomplete, unclear, and inconspicuous disclosures regarding required terms in fine print – fail to comply with the ARL.

[51] The text on the "Monthly" and "Yearly, billed upfront" subscriptions are substantially similar. The disclosure for the "Monthly" subscription reads: "By clicking "Agree and subscribe", you agree: **After your trial ends, you will be charged US$89.99(plus tax) monthly. Your subscription will automatically renew monthly until you cancel (price subject to change). Cancel before your trial ends and you won't be charged. Cancel anytime via Adobe Account or Customer Support.** Cancel before Jul 10, 2024 to get a full refund. You also agree to the Terms of Use and the Subscription and Cancellation Terms." (textual type and font pasted from the original).

The disclosure for the "Yearly, billed upfront" subscription reads: "By clicking "Agree and subscribe", you agree: **After your trial ends, you will be charged US$659.88 (plus tax) annually. Your subscription will automatically renew annually until you cancel (price subject to change). Cancel before your trial ends and you won't be charged. Cancel anytime via Adobe Account or Customer Support.** Cancel before Jul 10, 2024 to get a full refund. You also agree to the Terms of Use and the Subscription and Cancellation Terms."(textual type and font pasted from the original).

canceled "before Jul 10" to "avoid a fee" (*i.e.*, the first charge after the expiration of the free trial). *Id.* This problem is compounded, rather than cured, by the other information displayed on the Checkout Page which indicates that a "[f]ee applies if [consumers] cancel after 14 days" and the "trial ends, on June 27, 2024." This information, again, leaves consumers wondering when their free trial ends given that the relevant portion of the Checkout Page states that paid subscriptions may be canceled "anytime." *Id.* As a result of this conflicting information, consumers are left wondering, when, exactly they must cancel their "trial" or, alternatively, whether any of the dates apply to the cancelation of their paid subscription—which would contradict the "cancel anytime" verbiage. Finally, because the relevant portion of the Checkout Page states that consumers will obtain a "refund and avoid a fee" if they cancel by a given date, it is unclear whether upon canceling the subscription the Adobe Subscriptions will continue until the next billing period or the Adobe Subscription will immediately terminate entitling consumers to a partial refund for the remainder of their monthly or yearly charges.  In sum, because Defendant's confusing Checkout Page makes it unclear (a) when consumers must cancel their Adobe Subscriptions or free trials to prevent the free trial of the Adobe Subscriptions from continuing into a paid subscription and (b) whether canceling the paid Adobe Subscriptions immediately terminates the subscription or if it continues to run until the next billing cycle. As such, Defendant fails to disclose "[t]hat the subscription or purchasing agreement will continue until the consumer cancels," *id.* § 17601(b)(1), in the manner required by statute, *see id.* § 17602(a)(1).

54.     Second, the Checkout Page does not clearly and conspicuously disclose "[t]he description of the cancellation policy that applies to the offer."  Cal. Bus. & Prof. Code § 17601(b)(2).  Specifically, although the relevant portion indicates that consumers' "subscription will automatically renew monthly until [they] cancel" and that they may "[c]ancel anytime," this information is directly contradicted by the specific deadlines provided elsewhere on the Checkout Page. *See supra* ¶ 52. Furthermore, Defendant fails to specify the consequences of canceling the subscriptions. For instance, the relevant portion of the Checkout Page of the "Yearly, billed monthly" plan indicates that consumers must "cancel before Jul 10, 2024 to get a full refund and avoid a fee," *see id.*, Defendant, however, does not specify what it means by a "full refund" or

"fee." Instead, a consumer would need to click on the blue "Subscription and Cancellation Terms" buried at the bottom of the subscription terms where Defendant explains that if consumers "cancel after 14 days, [they will] be charged a lump sum amount of 50% of [their] remaining contract obligation[.]"[52] In other words, Defendant defines "fee" as synonymous with liquidated damages in the amount of 50% of a consumer's remaining *yearly* payments. This constitutes a clear and material omission of fact. If consumers were aware of these onerous liquidated damages "fee," they would likely have not purchased the Adobe Subscription or would have canceled it before the deadline. Similarly, for the "Monthly" and "Yearly, billed upfront" payment plans, the relevant portion of the Checkout Page states that consumers must "[c]ancel before Jul 10, 2024 to get a full refund." *See supra*, fn. 49.  What Defendant omits, however, is that a consumer may only cancel the "Monthly" but not the "Yearly, billed upfront" after the specified date. The "Yearly, billed upfront" cancelation limit, however, is modified by the previous sentence, which states that consumers may "[c]ancel anytime." *Id.* As such, consumers are led to believe that, like the other payment plans, they may still receive a partial refund if they cancel their subscription after the specified deadline. Despite this, Defendant again buries within its Subscription and Cancelation Terms the fact that "[s]hould [consumers] cancel after 14 days, [their] payment is non-refundable, and [their] service will continue until the end of your contracted term."[53] Finally, Defendant's "Monthly" payment plan also misleads consumers into believing that they must "[c]ancel before Jul 11, 2024 to get a full refund," which is plainly at odds with the previous sentence stating that they may "[c]ancel anytime." *See supra*, fn. 49. This contradiction is actually reinforced, rather than cured, by Defendant's hyperlinked disclosure which states that if consumers "cancel after 14 days, [their] payment is non-refundable, and [their] service will continue until the end of that month's billing period."[54] This sentence, however, is misleading because it gives the impression that the subscription (i.e., the "service") will terminate at the end of the month while leaving open

---

[52]Adobe Subscription and Cancellation Terms, *Creative Cloud for Individuals*, https://www.adobe.com/legal/subscription-terms.html (last accessed June 20, 2024).

[53] *Id.*

[54] *Id.*

the possibility that their monthly payments are non-refundable or not **fully** refundable—that is, that there might be additional fees or payments after canceling the subscription. In sum, because Defendant's fails to conspicuously disclose the deadlines and consequences associated with canceling the Adobe Subscriptions, and associated free trials, it also fails to conspicuously describe "[t]hat the subscription or purchasing agreement will continue until the consumer cancels," *id*. § 17601(b)(2), in the manner required by statute, *see id*. § 17602(a)(1).

55.     Third, the Checkout Page does not clearly and conspicuously disclose "[t]he recurring charges that will be charged to the consumer's Payment Method as part of the automatic renewal plan or arrangement." Cal. Bus. & Prof. Code § 17601(b)(3).  Specifically, although the relevant portion of the Checkout Page indicates that consumers will be charged "US$59,99 (plus tax)," *see supra* ¶ 52, it leaves them guessing as to the total amount amounts of their recurring charges until Defendant charges their Payment Method—something Defendant could have easily disclosed beforehand.  In fact, the statement is rendered even more inconspicuous by the much larger price figure provided above the block of text in question and immediately next to the all-cap bold "DUE NOW" statement.  Underneath that statement, another larger figure of US$59.99/mo appears next to the bold "After trial ends, on Jun 28, 2024" statement because the recurring monthly price listed (albeit inconspicuously) is US$59.99 per month, but, as discussed below, the actual recurring monthly price charged to Plaintiff's and other California consumers' Payment Methods in connection with the Adobe Subscriptions includes the full membership fee *and an additional undisclosed amount in tax*.  Thus, even had this required automatic renewal offer term been conspicuously disclosed in the Checkout Page (it was not), the disclosure as written provides false information, and, based on that statement, a subscriber is not placed on notice of the precise recurring amount that will be automatically withdrawn from his or her Payment Method each renewal period in connection with the Adobe Subscriptions.  Thus, Defendant fails to provide notice of "[t]he recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement," *id*. § 17601(b)(3), in the manner required by statute, *see id*. § 17602(a)(1).

56.     Fourth, the Checkout Page does not clearly and conspicuously disclose "[t]he length of the automatic renewal term or that the service is continuous."  Cal. Bus. & Prof. Code § 17601(b)(4).  For instance, for the "Yearly, billed monthly" subscription, although the relevant portion of the above-pictured Checkout Page indicates that "[b]y clicking "Agree and subscribe," [consumers] agree [that] [a]fter [their] trial ends, [they] will be charged US$59.99 (plus tax) monthly," immediately thereafter, the disclosure states that "[a]t the end of [their] one-year term, [their] subscription will automatically renew monthly until [they] cancel[.]" *See supra* ¶¶ 42-43. Based on the disclosure's plain meaning, the "one-year term" statement makes the length of the subscription unintelligible. On a literal level, because the statement "one-year term" is untethered to anything else, it could only be read to modify the length of the "trial" after which the "monthly" charges are set to begin (as stated twice in the preceding and proceeding sentence). Alternatively, the "one-year term" reads like a scribbler error.  This confusion is compounded by the text found elsewhere on the Checkout Page. Specifically, the term "Yearly, billed monthly" found elsewhere on the Checkout Page makes it unclear whether "US$59.99" is the monthly sum of a ***yearly rate*** to be billed pursuant to a ***monthly subscription*** as opposed to the locked-in ***monthly rate*** of a ***yearly subscription***. In other words, Defendant's conflicting information fails to state what the "billing" period is: either (a) a "one-year term"; (b) an automatically renewing "monthly" term; or (c) a "one-year term" followed by an automatically renewing "monthly" term.  *Id.* Nor does the buried Subscription and Cancelation Terms hyperlink help clarify this ambiguity, instead, it merely states that a consumer's "subscription begins as soon as [their] initial payment is processed and that "[f]or automatic renewing customers in the United States, after the first year, [their] subscription will automatically renew on a monthly basis until [they] cancel."[55] Similarly, for all of the Paid Subscriptions, Defendant fails to clarify when their respective "trial ends." The relevant portion of the Checkout Page states that consumers must cancel "before [their] trial ends and [they] won't be charged" and subsequently states that consumers may "[c]ancel before Jul 10, 2024 to get a full refund." *See supra*, fn. 49. A reasonable interpretation of the text, then, means that consumers'

---

[55] *Id.*

"trial" lasts up to "Jul 10"—the only time reference given to indicate when they can use Defendant's products without incurring a financial obligation.  That text, however, is contradicted by the "Free trial terms" found elsewhere on the Checkout Page which indicate that consumers must "[c]ancel before June 27 to avoid getting billed." *Id.* Thus, a consumer is left with three puzzling possibilities, either their free trial (*i.e.*, using the services without having to permanently dispense with their money): (1) ends on June 27, (2) ends on July 10, or (3) the words "trial" and "free trial" have different meanings subject to different deadlines. *Id.* This, again, is problematic because regardless of the type of payment plan, consumers are at a loss regarding when their "free trial" ends and their paid Adobe Subscriptions formally begin. Finally, none of the dates provided on the Checkout Page indicate what time zone is used to determine each of the triggering deadlines related to the free trials or Adobe Subscriptions—a non-trivial matter considering that the cost of the subscriptions runs as high as "US$659.88." In sum, because it is unclear when the Adobe Subscriptions commence, Defendant fails to disclose "[t]hat the subscription or purchasing agreement will continue until the consumer cancels," *id*. § 17601(b)(4), in the manner required by statute. *see id*. § 17602(a)(1).

57.    In sum, neither of the statements discussed above concerning cancellation constitutes a fulsome or clear description of Defendant's cancellation policy.  Indeed, other webpages of the Adobe Website beyond the Checkout Page – none of which are shown to subscribers during the enrollment process – are much clearer about the cancellation deadline, process, and the consequences of cancellation (or failing to cancel the Adobe Subscriptions in advance of the cut-off deadline).  These undisclosed terms concerning how and when to cancel, the consequences of doing so, and the availability of a refund for consumers that cancel within a specified period after enrollment constitute material aspects of Defendant's cancellation policy.  At no point during the life of his Adobe Subscription was Plaintiff required or even prompted to navigate to or otherwise examine any of the terms disclosed on any other page of the Adobe Website, aside from the Checkout Page.  Thus, Plaintiff was not aware of the omitted and inadequately disclosed automatic renewal terms discussed above.  Yet, prior to checkout, Defendant was obligated by law to place consumers on notice of these aspects of Defendant's

cancellation policy in accordance with the ARL, which requires that companies provide such information "in visual proximity to the request for consent to the [automatic renewal] offer."  Cal. Bus. & Prof. Code § 17602(a)(1); *see also id.* § 17601(b)(2).  It is not enough that the cancellation policy may be set forth on the hyperlinked pages located elsewhere on the Adobe Website; the ARL requires that Defendant present its full cancellation policy directly on the Checkout Page – and it must further do so "clearly and conspicuously," *id.* § 17601(c), and with the requisite proximity (*i.e.*, they must appear in the block of text immediately above the final blue checkout button on the bottom of that page), *see id.* § 17602(a)(1) – so as to allow the consumer to read and review the applicable offer terms immediately prior to purchase.[56]  However, Defendant failed, and continues to fail, to satisfy that requirement, in violation of Section 17602(a)(1) of the ARL.

58.    As a result of Defendant's missing and otherwise deficient pre-purchase disclosures, when Plaintiff selected and enrolled in his Adobe Subscription, he was unaware that Defendant enrolled him in an annual "automatic renewal" program under which his Adobe Subscription resulted in continuous monthly automatic renewal charges to his Payment Method, unless and until he effectively canceled the subscription by paying the Cancellation Fee.

---

[56] Indeed, reference to hyperlinks leading to required disclosures set forth on other pages of the Adobe Website is not tantamount to disclosure of them on the Checkout Page, as the ARL requires. *See Turnier v. Bed Bath & Beyond Inc.*, 517 F. Supp. 3d 1132, 1139-40 (S.D. Cal. 2021) (ARL Case) ("Defendant … argues the required terms were accessible through a hyperlink that was a few centimeters from the request for consent.  **But the terms themselves—not the access point to them—need to be in visual proximity to the request**.") (emphasis added).  Since businesses' "inclusion of autorenewal terms in fine print" was "the practice that led to ARL" in the first place, and "[t]he use of a hyperlink to the terms presents a similar practice," *id.* at 1140 n.6 (citation omitted), any required disclosures that may be contained in the hyperlinked webpages—*but not provided directly on the Checkout Page itself*—cannot satisfy the ARL.  *See also id.* at 1139-40 ("The required terms do not appear on the webpage that contains the request for consent. Defendant argues it is common to use a hyperlink to terms and conditions, and that practice is sufficient to form a valid contract.  That might be true.  However, it does not change what is required under ARL (the disclosure of terms in a specific manner and location).  **Given the terms appear nowhere near the request for consent, Plaintiff has plausibly alleged Defendant did not comply with section 17602(a)(1)**.") (emphasis added and internal citations omitted).

ii. **Defendant Fails To Obtain Consumers' Affirmative**
 **Consent To The Automatic Renewal Terms Associated**
 **With The Adobe Subscriptions.**

59. Second, at no point during the checkout process does Defendant require consumers to read or affirmatively agree to any terms of service associated with their Adobe Subscriptions, *i.e.*, by requiring consumers to select or click a "checkbox" next to the automatic renewal offer terms to complete the checkout process. Accordingly, when Defendant automatically renews customers' Adobe Subscriptions, Defendant charges consumers' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Cal. Bus. & Prof. Code § 17602(a)(2).

iii. **Defendant Fails To Provide A Post-Checkout**
 **Acknowledgment That Clearly And Conspicuously**
 **Discloses The Required Adobe Subscription Offer Terms.**

60. Finally, after Plaintiff and the members of the Class subscribed to one of Defendant's Adobe Subscriptions, Defendant sent to Plaintiff and the Class email follow-ups regarding their purchases (the "Acknowledgment Email").

61. By way of example, at least as of June 2024, consumers who enrolled in the *free trial* for the Adobe Subscription received an email from Defendant upon completion of the checkout process. The subject line of the Acknowledgment Email that Defendant sent to Adobe Creative Cloud All Apps 100GB subscribers, stated: "Welcome to your free trial!" The body of the Acknowledgment Email contained, in relevant part, the following text and images:

//

//

//

//

//

//

//

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



62.     Similarly, at least as of June 2024, when consumers sign up for the straight-to-paid Adobe Subscriptions, Defendant sent subscribers a nearly identical Acknowledgment Email, featuring substantially the same disclosures with the subject line: "Thanks for your purchase." The body of the Acknowledgment Email contained, in relevant part, the following text and images:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





63.     The layout and text of the Acknowledgment Emails for each of the other Adobe

Subscriptions during the applicable Class Period are aesthetically and functionally similar to the

Acknowledgment Email for the free trial and straight-to-paid Adobe Subscriptions shown above.

Moreover, although the above-shown Acknowledgment Emails are exemplars from approximately

June 2024, the Acknowledgment Emails that Defendant has sent to new subscribers of the Adobe Subscriptions during the Class Period (including on June 2022, when Mr. Singh enrolled in his Adobe Subscription, to and through the present day) are substantively and materially identical or substantially the same in terms of layout, organization, and most importantly, text, as the June 2024 versions shown above.  In all cases, the Acknowledgment Emails for the Adobe Subscriptions fail to adequately disclose the applicable automatic renewal terms in the manner required by law.

64.     The Acknowledgment Emails suffer from substantially the same deficiencies as those on the Checkout Pages for the Adobe Subscriptions, described above.  Namely, the Acknowledgment Emails do not adequately disclose: that the subscription "will continue until the consumer cancels[,]" Cal. Bus. & Prof. Code § 17601(b)(1); a statement of "[t]he recurring charges that will be charged to the consumer's [Payment Method] as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, [and] if that is the case, and the amount to which the charge will change, Cal. Bus. & Prof. Code § 17601(b)(3); or "[t]he length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer[,]" Cal. Bus. & Prof. Code § 17601(b)(4).  As in the Checkout Page, disclosures of these required automatic renewal terms are either missing altogether, are deceptively incomplete, objectively inaccurate, and/or are inconspicuously buried in the tiny fine print at the bottom of the email.  As a result, the Acknowledgment Email further violates the ARL under Cal. Bus. & Prof. Code §§ 17602(a)(3) and 17602(b).

65.     Additionally, the Acknowledgment Emails fail to provide a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation, and, in fact, Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Adobe Subscriptions, which further violates the ARL under Cal. Bus. & Prof. Code § 17602(c).

* * *

66.     In sum, Defendant's deficient pre- and post-purchase disclosures and lack of affirmative consent fail to comply with the ARL.  By and through these actions, Defendant has

charged Plaintiff's and Class members' Payment Methods in direct violation of the ARL.  As a result, all goods, wares, merchandise, and/or products sent to Plaintiff and the Class upon the automatic renewal of their continuous service agreements are deemed to be "unconditional gifts" pursuant to Cal. Bus. & Prof. Code § 17603.

67.     Because Defendant failed to disclose this material information in the manner required by statute, Plaintiff was unable at the point of sale to accept or provide affirmative consent to Defendant's offer or knowingly enter into the purchase agreements.  Thus, as a direct result of Defendant's missing, incomplete, and otherwise deficient disclosures on the Checkout Page and in the Acknowledgment Email, Plaintiff was induced to sign up for, unable to terminate, and automatically charged for his Adobe Subscription.

68.     Further, as a direct result of Defendant's unlawful conduct described above, Plaintiff and putative Class Members have incurred substantial financial injury in the form of all monies withdrawn from their Payment Methods in connection with the Adobe Subscriptions.  Specifically, Defendant's ARL violations concerning the Adobe Subscriptions caused Plaintiff's and Class members' financial injury because they reasonably relied on the conspicuous disclosures of Defendant's Checkout Page and Acknowledgment Email (and, as a natural corollary, the omissions and/or the inconspicuousness of the disclosures contained therein) in deciding whether to purchase their Adobe Subscriptions in the first place and whether to continue paying for it upon after that (*i.e.*, by not cancelling the auto-renewal).

69.     Accordingly, Plaintiff brings this action individually and on behalf of similarly situated individuals against Defendant for violations of California's consumer protections statutes, including California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200.  As set forth in detail below, Plaintiff's claims, which are based on Defendant's failure to comply with the ARL, arise under the "unlawful" prong of the UCL.  Further, because the Adobe Subscriptions were, by operation of law, "unconditional gifts" to Plaintiff and putative Class Members (*see* Cal. Bus. & Prof. Code § 17603) – and thus, Plaintiff and Class Members already owned the goods, tools, and benefits of the subscriptions as their personal property at the time Defendant withdrew monies from their Payment Methods as consideration for access to the same, without any legal or

contractual authority to do so – Plaintiff's claims are also based on Defendant's practice of charging consumers in exchange for unconditional gifts and arise under the "fraudulent" and "unfair" prongs of the UCL.  Additionally, Plaintiff brings this action against Defendant for violations of the CLRA and FAL, and conversion, unjust enrichment, negligent misrepresentation, and fraud.

## CLASS ACTION ALLEGATIONS

70.     ***Class Definition***.  Plaintiff brings this action pursuant to Code of Civil Procedure § 382 and Civil Code § 1781 on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All persons in California who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, incurred renewal fee(s) in connection with Defendant's offerings for paid Adobe Subscriptions.

71.     Specifically excluded from the Class are Defendant and any entities in which Defendant have a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

72.     Plaintiff reserves the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

73.     ***Numerosity.***  Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, the Class comprises at least millions of consumers throughout California.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

74.     ***Commonality and Predominance***.  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether Defendant's Adobe Subscriptions constitute "Automatic renewal[s]" within the meaning of Cal. Bus. & Prof. Code § 17601(a); (b) whether Defendant failed to present the automatic renewal offer terms, or

continuous service offer terms, in a clear and conspicuous manner before the subscription or purchasing agreement was fulfilled and in visual proximity to the request for consent to the offer, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (c) whether Defendant charged Plaintiff's and Class members' Payment Method for an automatic renewal or continuous service without first obtaining their affirmative consent to the automatic renewal offer terms or continuous service offer terms in violation of Cal. Bus. & Prof. Code § 17602(a)(2); (d) whether Defendant failed to provide an acknowledgment that included the automatic renewal or continuous service offer terms, cancellation policy, and information on how to cancel in a manner that is capable of being retained by Plaintiff and the Class, in violation of Cal. Bus. & Prof. Code § 17602(a)(3); (e) whether the goods and services provided by Defendant are deemed an "unconditional gift" in accordance with Cal. Bus. & Prof. Code § 17603; (f) whether Defendant's conduct alleged herein violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*, California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, and/or California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (g) whether Defendant's conduct alleged herein constitutes conversion and/or unjust enrichment; (h) whether Plaintiff and the Class are entitled to damages and/or restitution; (i) whether Defendant should be enjoined from further engaging in the misconduct alleged herein; and (j) whether Plaintiff and the Class are entitled to attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

75. ***Typicality.*** The claims of Plaintiff Singh are typical of the claims of the Class in that Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to obtain Plaintiff's and the Class's affirmative consent to the automatic renewal offer terms or continuous service offer terms associated with the Adobe Subscriptions before charging their Payment Methods.

76. ***Adequacy***. Plaintiff will fairly and adequately protect Class members' interests. Plaintiff has no interests antagonistic to Class members' interests, and Plaintiff has retained counsel that have considerable experience and success in prosecuting complex class-actions and consumer-protection cases.

77.     ***Superiority***.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

78.     Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

79.     Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and members of the Class and will likely retain the benefits of its wrongdoing.

80.     Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

## <u>COUNT I</u>
**Violations of California's Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

81.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

82.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

83.     The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]"  Cal. Bus. & Prof. Code § 17200.  The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL.  Cal. Bus. & Prof. Code § 17204.  Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by the unlawful and/or unfair business practice or act.

84.     As alleged below, Defendant has committed unlawful and/or unfair business practices under the UCL by: (a) representing that Defendant's goods and services have certain characteristics that they do not, in violation of Cal. Civil Code § 1770(a)(5); (b) advertising goods

and services with the intent not to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9); and (c) converting to Defendant's own use and benefit money that rightfully belongs to Plaintiff and the Class.

85.     Additionally, at all relevant times, Defendant has violated, and continues to violate, the UCL's proscription against engaging in unlawful and/or unfair conduct as a result of its violations of the ARL, Cal. Bus. & Prof. Code §§ 17600, *et seq.*  Specifically, Defendant failed, and continues to fail, to: (a) provide the auto-renewal terms associated with its Adobe Subscriptions "in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer," in violation of Cal. Bus. & Prof. Code § 17602(a)(1); (b) obtain the affirmative consent of Plaintiff and the Class to those terms before charging their Payment Methods, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and (c) provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(3).  Defendant also makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Adobe Subscriptions, in violation of Cal. Bus. & Prof. Code § 17602(b).

86.     Each of these acts and practices constitutes an independent violation of the ARL, and thus an independent violation of the UCL.

87.     All products received from Defendant in violation of the ARL, Cal. Bus. Prof. Code §§ 17602, *et seq.*, constitute "unconditional gifts."  *See* Cal. Bus. Prof. Code § 17603.  As a direct and proximate result of Defendant's unlawful and/or unfair practices described herein, Defendant has received, and continues to hold, unlawfully obtained property and money belonging to Plaintiff and the Class in the form of payments made by Plaintiff and Class members for their Adobe Subscriptions.  Defendant has profited from its unlawful and/or unfair acts and practices in the amount of those business expenses and interest accrued thereon.

88.     Defendant's acts and omissions as alleged herein violate obligations imposed by statute, are substantially injurious to consumers, offend public policy, and are immoral, unethical,

1    oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits

2    attributable to such conduct.

3         89.    There were reasonably available alternatives to further Defendant's legitimate

4    business interests, other than the conduct described herein.

5         90.    Defendant's acts, omissions, nondisclosures, and misleading statements as alleged

6    herein were and are false, misleading, and/or likely to deceive the consuming public.

7         91.    Plaintiff and the members of the Class have suffered a substantial injury in fact and

8    lost money by virtue of Defendant's acts of unfair competition, which caused them to purchase the

9    Adobe Subscriptions.  Had Defendant complied with its disclosure obligations under the ARL,

10   Plaintiff and members of the Class would not have purchased their Adobe Subscriptions or would

11   have canceled their Adobe Subscriptions prior to the renewal of the subscriptions, so as not to

12   incur additional fees.  Thus, Plaintiff and members of the Class were damaged and have suffered

13   economic injuries as a direct and proximate result of Defendant's unlawful and/or unfair business

14   practices.

15        92.    Defendant's violations have continuing and adverse effects because Defendant's

16   unlawful conduct is continuing, with no indication that Defendant intends to cease this unlawful

17   course of conduct.  The public and the Class are subject to ongoing harm because the unlawful

18   and/or unfair business practices associated with the Adobe Subscriptions are still used by

19   Defendant today.

20        93.    Plaintiff and the Class seek restitution pursuant to Cal. Bus. & Prof. Code § 17203

21   of all amounts that Defendant charged or caused to be charged to Plaintiff's and the Class's

22   Payment Methods in connection with their Adobe Subscriptions during the four years preceding

23   the filing of this Complaint.  Defendant should be required to disgorge all the profits and gains it

24   has reaped and restore such profits and gains to Plaintiff and the Class, from whom they were

25   unlawfully taken.

26        94.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and members of the Class

27   seek a court order enjoining Defendant from such future misconduct, and any other such orders

28   that may be necessary to rectify the unlawful business practices of Defendant.

95.     Plaintiff brings this action as private attorney general to vindicate and enforce an important right affecting the public interest.  Plaintiff and the Class are therefore entitled to an award of attorneys' fees under Code of Civil Proc. § 1021.5 for bringing this action.

## COUNT II
### Conversion

96.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

97.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

98.     As a result of charges made by Defendant to Plaintiff's and Class members' Payment Methods without authorization and in violation of California law, Defendant has taken money that belongs to Plaintiff and the Class.

99.     The amount of money wrongfully taken by Defendant is capable of identification.

100.    Defendant engaged in this conduct knowingly, willfully, and with oppression, fraud, and/or malice within the meaning of Cal. Civil Code § 3294(c).

101.    As a result of Defendant's actions, Plaintiff and the Class have suffered damages.

## COUNT III
### Violations of California's False Advertising Law ("FAL"),
### Cal. Bus. & Prof. Code §§ 17500, *et seq.*

102.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

103.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

104.    California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state,  …in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and

which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

105.    Defendant committed acts of false advertising, as defined by § 17500, by intentionally making and disseminating statements to consumers in California and the general public concerning Defendant's products and services, as well as circumstances and facts connected to such products and services, which are untrue and misleading on their face and by omission, and which are known (or which by the exercise of reasonable care should be known) by Defendant to be untrue or misleading.  Defendant has also intentionally made or disseminated such untrue or misleading statements and material omissions to consumers in California and to the public as part of a plan or scheme with intent not to sell those services as advertised.

106.    Defendant's statements include but are not limited to representations and omissions made to consumers before and after enrollment in Defendant's Adobe Subscriptions regarding the terms of payment for and cancellation of a consumer's automatic payments.  Defendant is silent with regard to the terms of its cancellation policy.  These omissions on the Checkout Page and the Acknowledgment Email constitute false and deceptive advertisements.

107.    Defendant's actions in violation of § 17500, as described herein, were false and misleading such that the general public is and was likely to be deceived.

108.    Plaintiff and the members of the Class were deceived by Defendant's statements and omissions made online when they signed up and started paying for their Adobe Subscriptions, and there is a strong probability that other California consumers and members of the public were also or are likely to be deceived as well.  Any reasonable consumer would be misled by Defendant's false and misleading statements and material omissions.  Plaintiff and other members of the Class did not learn of Defendant's cancellation and automatic payment policies until after they had already signed up and started paying for Defendant's Adobe Subscription.  They relied on Defendant's statements and omissions to their detriment.

109.    Plaintiff and the Class lost money or property as a result of Defendant's FAL violations because they would not have purchased the Adobe Subscriptions on the same terms if

1  the true facts were known about the product and the Adobe Subscriptions do not have the

2  characteristics as promised by Defendant.

3       110.    Plaintiff, individually and on behalf of all similarly situated California consumers,

4  seeks individual, representative, and public injunctive relief and any other necessary orders or

5  judgments that will prevent Defendant from continuing with its false and deceptive advertisements

6  and omissions; restitution that will restore the full amount of their money or property;

7  disgorgement of Defendant's relevant profits and proceeds; and an award of costs and reasonable

8  attorneys' fees.

9                              **COUNT IV**

10  **Violations of California's Consumers Legal Remedies Act ("CLRA"),**
    **Cal. Civ. Code §§ 1750, *et seq.***

11       111.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the

12  preceding paragraphs as though alleged in this Count.

13       112.    Plaintiff brings this claim individually and on behalf of the members of the

14  proposed Class against Defendant.

15       113.    Plaintiff and the members of the Class are "consumers" within the meaning of Cal.

16  Civil Code § 1761(d) in that Plaintiff and the Class sought or acquired Defendant's goods and/or

17  services for personal, family, or household purposes.

18       114.    Defendant's selection and/or subscription offers and the other products pertaining

19  thereto are "goods" and/or "services" within the meaning of Cal. Civil Code § 1761(a) and (b).

20  The purchases by Plaintiff and the Class are "transactions" within the meaning of Cal. Civil Code

21  § 1761(e).

22       115.    The acts and practices of Defendant as described above were intended to deceive

23  Plaintiff and the Class as described herein, and have resulted, and will result, in damages to

24  Plaintiff and the Class.  These actions violated, and continue to violate, the CLRA in at least the

25  following respects: (a) Defendant's acts and practices constitute representations or omissions

26  deceiving that the Adobe Subscriptions have characteristics, uses, and/or benefits, which they do

27  not, in violation of Cal. Civil Code §1770(a)(5); and (b) Defendant's acts and practices constitute

28

the advertisement of the goods in question without the intent to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9).

116.     Plaintiff and the Class suffered economic injury as a direct result of Defendant's misrepresentations and/or omissions because they were induced to purchase Adobe Subscriptions and/or pay renewal fees they would not have otherwise purchased and/or paid.  Had Defendant fully and clearly disclosed the terms associated with the Adobe Subscriptions, Plaintiff and the Class would not have subscribed to the Adobe Subscriptions, or they would have canceled their Adobe Subscriptions earlier, *i.e.*, prior to the expiration of the initial subscription period.

117.     Plaintiff, on behalf of himself and all other members the Class, seeks an injunction prohibiting Defendant from continuing its unlawful practices in violation of the CLRA.

118.     In compliance with the provisions of California Civil Code § 1782, Plaintiff sent written notice to Defendant on June 28, 2024, informing Defendant of his intention to seek damages under California Civil Code § 1750.  The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter expressly stated that it was sent on behalf of Plaintiff and "all other persons similarly situated."  Accordingly, if Defendant fails to take corrective action within 30 days of receipt of the demand letter, Plaintiff will amend his complaint to include a request for damages as permitted by Civil Code § 1782(d) for Defendant's violations of the CLRA.

## <u>COUNT V</u>
### Unjust Enrichment / Restitution

119.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

120.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

121.     Plaintiff and the Class conferred benefits on Defendant by purchasing the Adobe Subscriptions.

122.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and the Class's purchases of the Adobe Subscriptions.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant's failure to disclose material terms of the purchase agreement, in violation of California law, induced Plaintiff and the Class to purchase the Adobe Subscriptions.  These omissions caused injuries to Plaintiff and the Class because they would not have purchased the Adobe Subscriptions at all, or on the same terms, if the true facts were known.

123.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and the Class is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class for their unjust enrichment, as ordered by the Court.

<u>**COUNT VI**</u>
**Negligent Misrepresentation**

124.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

125.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

126.    As discussed above, Defendant omitted, failed to disclose, and intentionally concealed from its advertisements and related statements regarding the Adobe Subscriptions material facts concerning billing, cancellation, and automatic payment terms, policies, and requirements.

127.    At the time Defendant made these representations, Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

128.    At an absolute minimum, Defendant negligently misrepresented and/or negligently omitted material facts about the Adobe Subscriptions and their associated terms.

129.    The negligent misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually

induced Plaintiff and Class members to purchase and enroll in Defendant's Adobe Subscription programs.

130.    Plaintiff and Class members would not have purchased the Adobe Subscriptions if the true facts had been known.

131.    The negligent actions of Defendant caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT VII
### Fraud

132.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

133.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

134.    As discussed above, Defendant provided Plaintiff and Class members with false or misleading material information and failed to disclose material facts about the Adobe Subscriptions and their associated automatic renewal terms, including terms regarding Defendant's cancellation policy and billing practices and policies.  These misrepresentations and omissions were made by Defendant with knowledge of their falsehood.

135.    The misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase the Adobe Subscriptions.

136.    The fraudulent actions of Defendant caused damage to Plaintiff and the members of the Class, who are entitled to damages and other legal and equitable relief as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Vikram Singh, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.    For an order certifying the Class and naming Plaintiff as a representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b.    For an order declaring Defendant's conduct violates the statutes referenced herein;

c.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

d.    For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.    For prejudgment interest on all amounts awarded;

f.    For an order of restitution and all other forms of equitable monetary relief;

g.    For injunctive relief as pleaded or as the Court may deem proper; and

h.    For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: July 1, 2024                     Respectfully submitted,

                                        **BURSOR & FISHER, P.A.**


                                        By:    _/s/ Joshua R. Wilner_

                                        Joshua R. Wilner (State Bar No. 353949)
                                        1990 North California Blvd., Suite 940
                                        Walnut Creek, CA 94596
                                        Telephone: (925) 300-4455
                                        Facsimile: (925) 407-2700
                                        E-mail: jwilner@bursor.com

                                        **GUCOVSCHI ROZENSHTEYN, PLLC**
                                        Adrian Gucovschi (pro hac vice forthcoming)
                                        Benjamin Rozenshteyn (*pro hac vice* forthcoming)
                                        140 Broadway, 46th Floor
                                        New York, New York 10005
                                        Telephone: (212) 884-4230
                                        E-Mail: adrian@gr-firm.com
                                                 ben@gr-firm.com

                                        *Attorneys for Plaintiff and the Putative Class*

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, Joshua R. Wilner, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Singh in this action.  Plaintiff Vikram Singh alleges that he is a citizen of California who resides in Antioch, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that Defendant Adobe, Inc., regularly does business in the Northern District of California, and a substantial portion of the events alleged in the Complaint, including the same misrepresentations, omissions, and injures as alleged herein, have occurred in this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California, this 1st day of July, 2024.


                                                      */s/ Joshua R. Wilner*
                                                      Joshua R. Wilner