United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

VIKRAM SINGH, et al.,

Plaintiffs,

v.

ADOBE INC.,

Defendant.

Case No. 3:24-cv-03980-JSC

**ORDER RE: MOTION TO COMPEL ARBITRATION**

**RE: DKT. NO. 43**

Vikram Singh brought this putative class action on behalf of California consumers. He alleged that when consumers sign up for an Adobe subscription online, Adobe enrolls them into a program that automatically renews the subscriptions, and in doing so, fails to provide the requisite disclosures and authorizations California law requires. After the Court granted Adobe's motion to dismiss, Singh filed an Amended Complaint adding two additional Plaintiffs: Frank Nunez and Ashley Brooke. (Dkt. Nos. 34, 38.[1]) Adobe now moves to compel arbitration of Plaintiff Nunez and Brookes' claims and to dismiss Singh, Nunez, and Brooke's claims. (Dkt. Nos. 43, 46.) Because the briefing exposed ambiguities regarding contract formation, the Court requested supplemental briefing, which is now complete. (Dkt. Nos. 55, 56, 57, 58.) Having considered the parties' briefs and the legal authority, and having had the benefit of oral argument on July 31 2025, the Court GRANTS the motion to compel arbitration. Adobe's motion to dismiss is addressed by separate order.

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

**DISCUSSION**

The Federal Arbitration Act ("FAA") provides arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for revocation of any contract." 9 U.S.C. § 2. Under the FAA, "arbitration agreements [are] on an equal footing with other contracts," and therefore courts must "enforce them according to their terms." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (internal citations omitted). In resolving a motion to compel arbitration under the FAA, a court's inquiry is limited to two "gateway" issues: "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021) (quotation marks omitted). "If both conditions are met, the FAA requires the court to enforce the arbitration agreement in accordance with its terms." *Id.* (cleaned up).

Adobe moves to compel arbitration based on the "Dispute Resolution, Class Action Waiver, Arbitration Agreement**"** in Adobe's General Terms of Use (hereafter "the Arbitration Agreement"), which states in relevant part:

> If you have any concern or dispute that Adobe Customer Care is unable to resolve ("Claim"), you agree to first try to resolve the dispute informally and in good faith by contacting us and providing a written Notice of Claim to the address provided in section 18.2 (Notice to Adobe). The Notice of Claim must provide Adobe with fair notice of your identity, a description of the nature and basis of your Claim, and the relief you are seeking, including the specific amount of any monetary relief you are seeking, and cannot be combined with a Notice of Claim for other individuals. If any dispute related to your Claim is not resolved within 30 days of receipt, any resulting legal actions must be resolved through either small claims court or final and binding arbitration, including any dispute about whether arbitration is required for the dispute, subject to the exceptions set forth below. Neither party shall initiate legal action until 30 days after the Notice of Claim is received. This agreement to arbitrate shall apply, without limitation, to all claims that arose or were asserted before the effective date of the Terms. The arbitrator, and not any federal, state, or local court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability or enforceability of the Terms or formation of the Terms, including whether any dispute between us is subject to arbitration (i.e., the arbitrator will decide the arbitrability of any dispute) and whether all or any part of these Terms are void or voidable. Claims related to the Terms, Services, or Software are permanently barred if not brought within one year of the event resulting in the Claim.

(Dkt. No. 44-1 at 34.)



United States District Court
Northern District of California

There is no dispute either that the FAA governs, or under the second gateway inquiry, that the Arbitration Agreement encompasses the dispute at issue. Rather, the parties' disagreement arises out of the first gateway issue—the existence of a valid agreement to arbitrate. Plaintiffs insist there is no valid agreement because they were not provided notice of the arbitration agreement and did not manifest an unambiguous intent to be bound by its terms, and even if they did, the agreement is unconscionable.[2]

**A. Contract Formation**

The existence of an arbitration agreement is a question for the Court, not an arbitrator. *See Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014); *see also Reichert v. Rapid Invs., Inc.*, 826 F. App'x 656, 658 (9th Cir. 2020) ("Notwithstanding any delegation clause in the Agreement, 'challenges to the existence of a contract as a whole must be determined by the court prior to ordering arbitration.'") (cleaned up). As the party seeking to compel arbitration, Adobe bears the burden of proving the existence of an agreement to arbitrate. *Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023). When, as here, "the making of the arbitration agreement" is at issue, the summary judgment standard applies. *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) (quoting 9 U.S.C. § 4). To prevail under the summary judgment standard, Adobe must show there is no genuine issue as to any material fact regarding formation of the arbitration contract. *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Conversely, to deny the motion to compel arbitration, rather than hold a trial on arbitration agreement formation, the Court must find no reasonable trier of fact could find an agreement was made. *Hansen*, 1 F.4th at 670 ("once a district court concludes that there are genuine disputes of material fact as to whether the parties formed an arbitration agreement, the court must proceed without delay to a trial on arbitrability and hold any motion to compel arbitration in abeyance until the factual issues have been resolved"). In evaluating the record, the Court must "give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 517 (9th Cir. 2023).

[2] Plaintiffs also argued waiver, but the Court previously rejected that argument. (Dkt. No. 55 at 2.)

United States District Court
Northern District of California

"In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation."[3] *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). "To form a contract under ... California law, the parties must manifest their mutual assent to the terms of the agreement." *Id*. "Parties traditionally manifest assent by written or spoken word, but they can also do so through conduct." *Id*. "However, '[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.'" *Id*. (alteration in original) (quoting Restatement (Second) of Contracts § 19(2) (1981)). "These elemental principles of contract formation apply with equal force to contracts formed online. Thus, if a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed." *Id*. at 855–56.

In California, "internet contracts are classified 'by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps.'" *Keebaugh v. Warner Bros. Ent. Inc*., 100 F.4th 1005, 1014 (9th Cir. 2024) (quoting *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 463 (2021)). Here, a link to the Terms of Use was provided to Plaintiffs, but they were not required to separately indicate they had read and agreed to the terms; rather, "By clicking 'Agree and subscribe,'" they agreed to the Terms of Use. (Dkt. No. 44-5; Dkt. No. 54-1.) The Court thus employs the inquiry-notice "sign-in wrap" analytical framework. *See Berman*, 30 F.4th at 866 (citing *Sellers*, 73 Cal. App. 5th at 463–64).

> [A]n enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.

*Berman*, 30 F.4th at 856. "Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." *Berman*, 30 F.4th at 856 (cleaned up).

[3] The parties agree California law applies even as to Ms. Brooke, a New York resident. (Dkt. No. 43 at 12; Dkt. No. 50 at 8.)

**1. Notice of Adobe's Arbitration Provision**

As a threshold matter, the Court must determine what notice Plaintiffs Nunez and Brooke were provided when they enrolled in their Adobe subscriptions in October and November 2024. The Court requested supplemental briefing because the parties' prior briefing raised ambiguities regarding this issue. (Dkt. No. 55.)

In response, Nunez submitted a declaration attesting he signed up for what he thought was a free trial for an Adobe Photoshop subscription on a web browser on his phone in October 2024, but he cannot recall what the signup screen looked like. (Dkt. No. 56-2, Nunez Decl. at ¶¶ 3, 4.) Brooke attests she signed up for her Adobe Stock subscription using a web browser on her laptop in November 2024, but she cannot recall what the signup screen looked like. (Dkt. No. 56-3, Brooke Decl. at ¶¶ 3-4.)

Adobe responded with a second supplemental declaration from Arshiya Naseer, Adobe's Manager of Cloud Platform and Experiences. (Dkt. No. 58 at ¶ 1.) Ms. Naseer manages "the team of product managers responsible for building platform experiences for Adobe Commerce" and is "familiar with the enrollment and consent flow for Adobe's subscriptions that are purchased through Adobe.com by individual subscribers." (*Id.*) Her declaration is based on her personal knowledge and her review of "Adobe's records maintained in the ordinary course of its business, including engineering tickets (i.e., tasks and requests for the engineering team) for the checkout payment page, as well as the copy change history for the checkout payment page." (*Id.* at ¶ 4.) Given Nunez and Brooke's declarations regarding their sign-up processes, Ms. Naseer attests the screenshots attached to her prior declarations are "substantially identical" to what they would have experienced when they signed up for their respective subscriptions. (*Id*. at ¶¶ 4-6 (citing Dkt. No. 44-2 (Ex. B); Dkt. No. 44-5 (Ex. E); Dkt. No. 54-1 (Ex. F)).)

The screenshots offered by Plaintiffs' counsel Adrian Gucovschi of what he saw when he visited the Adobe website in March and June 2024 fail to create a dispute of fact regarding what Nunez and Brooke would have seen when they signed up in October and November 2024. (Dkt. No. 56-1, Gucovschi Decl. at ¶¶ 2, 9, Exs. A& B.) This is equally true for the screenshots offered by Plaintiffs' counsel Joshua Wilner regarding what he saw when he visited Adobe's website on

United States District Court
Northern District of California

May 5 and 6, 2025—several months after Plaintiffs signed up. (Dkt. No. 50-1.) It is irrelevant what Plaintiffs' counsel saw months prior or months after Plaintiffs' signup process. Further, neither Gucovschi nor Wilner actually replicated Nunez and Brooke's sign-up process. Nunez signed up for what he believed was a free trial of Adobe Photoshop on his phone and Brooke signed up for a straight-to-paid subscription for Adobe Stock on a web browser on her laptop. (Dkt. No. 56-2, Nunez Decl. at ¶ 3; Dkt. No. 56-3, Brooke Decl. at ¶ 3.) But the Wilner declaration only offers screenshots of what he saw when he attempted to sign up for a paid subscription for Adobe Photoshop and free trial to an Annual, billed monthly Adobe Stock subscription on a web browser on a computer. (Dkt. No. 50-1, Wilner Decl. at ¶¶ 2-6, 12-15.) And the Gucovschi declaration only offers screenshots of what he saw when he attempted to sign up for free trial to paid Acrobat Pro and Creative Cloud All Apps subscriptions on a web browser on his computer. (Dkt. No. 56-1, Gucovschi Decl. at ¶¶ 5-9.) Thus, neither replicated the subscriptions and sign-up process for Nunez and Brooke. However, there is no material difference—or at least none Plaintiffs have identified—between the screenshots offered by Plaintiffs' counsel and those offered by Adobe as to what Brooke would have seen on a web browser on her laptop.

Regardless, Nunez and Brooke neither dispute that the screenshots offered by Ms. Naseer are the same as what they saw nor offer any evidence regarding what they saw; rather, they attest they cannot recall what they saw. *See Saeedy v. Microsoft Corp.*, 757 F. Supp. 3d 1172, 1197 (W.D. Wash. 2024) ("neither Plaintiffs' inability to recall seeing reference to the terms, nor their failure to review terms overcomes the evidence of assent" and collecting cases re: same). Under these circumstances, Adobe has satisfied its burden of demonstrating what Nunez and Brooke would have seen when they signed up in October and November 2024. *See Hong v. StubHub, Inc.*, No. 2:24-CV-03318-SB-JC, 2024 WL 4720924, at *4 (C.D. Cal. Sept. 9, 2024) ("Defendant has produced unrebutted evidence that the screenshot is substantially similar to what Plaintiff would have seen in May 2023" which "satisfies its burden.").

Accordingly, following screenshot reflects what Nunez would have seen when he signed up for his Adobe Photoshop subscription in October 2024:

United States District Court
Northern District of California




(Dkt. No. 44-5 at 2.)

For her part, Brooke would have seen the following screenshot when she purchased her Adobe Stock subscription in November 2024:



(Dkt. No. 54-1 at 2; *see also* Dkt. No. 44-2 at 2 (same page without the credit card information expanded).[4])

**2. Reasonably Conspicuous Notice**

Under California law, the question of whether "the website provides reasonably conspicuous notice of the terms to which the consumer will be bound" is "fact-intensive" and is informed by the "totality of the circumstances." *Godun v. JustAnswer LLC*, 135 F.4th 699, 709 (9th Cir. 2025) (internal citations omitted). "[U]nder California law— 'even minor differences' in the design elements may make the difference in this fact-intensive analysis. At bottom, when visually analyzing the conspicuousness of an advisal and any hyperlinks, courts must be tuned to the expectations of a reasonably prudent internet user." *Id.* at 710 (quoting *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 481 (2021)).

Plaintiffs insist they did not receive reasonably conspicuous notice because "the paragraph containing the hyperlink is the smallest font size on the entire page, significantly smaller than the font used for the price information, the boxes where personal information is to be entered, and the 'Agree and subscribe' button." (Dkt. No. 50 at 18.) Further, the text is "at the very bottom of the page and set apart from all the relevant information." (*Id.*)

The Court first considers the "visual conspicuousness" which "is a matter of whether an advisal is 'displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.'" *Godun*, 135 F.4th at 709 (quoting *Berman*, 30 F.4th at 856)). The following shows the relevant portion of the payment pages for Nunez and Brooke:

[4] The screenshot offered by Plaintiffs' counsel has the advisal text to the right of the "Agree and subscribe button," (Dkt. No. 56-1 at 5), but as Plaintiffs allege in the SAC, the advisal text stacks when a consumer scrolls down on the page (Dkt. No. 38 at ¶ 55).

Your cart

Photoshop

Subscription

Monthly US$34.49/mo

Subtotal US$34.49/mo

TOTAL US$34.49/mo

+ tax

By clicking "Agree and subscribe", you agree: You will be charged US$34.49 (plus tax) monthly. Your subscription will automatically renew monthly until you cancel. Price subject to change at renewal. Cancel before Apr 29, 2025 to get a full refund. Cancel anytime via Adobe Account or Customer Support. You also agree to the Terms of Use and the Subscription and Cancellation Terms.

Agree and subscribe

Back




(Dkt. No. 44-5 (Nunez); Dkt. No. 54-1 (Brooke).)

A reasonable user would have seen the advisal and been able to locate the Terms of Use via the hyperlink. First, the advisal regarding acceptance of the Terms of Use "is conspicuously displayed directly above [] the action button" that a user must accept before subscribing. *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 516 (9th Cir. 2023). Second, as in *Oberstein*, the text directly above the "Agree and subscribe" button is bolded and states "By clicking 'Agree and subscribe,' … [y]ou also agree to the Terms of Use and the Subscription and Cancellation Terms" (Dkt. Nos. 44-5, 54-1), which "clearly denotes 'that continued use will act as a manifestation of the user's intent to be bound.'" *Oberstein*, 60 F.4th at 516 (quoting *Nguyen*, 763 F.3d at 1177). Finally, the Terms of Use hyperlink is "conspicuously distinguished from the surrounding text in bright blue font, making its presence readily apparent." *Oberstein*, 60 F.4th at 516; *see also Berman*, 30 F.4th at 857 (noting "a failure to clearly denote the hyperlinks" such as through "the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage" fails the conspicuousness test).



United States District Court
Northern District of California

The notice here is distinguishable from the deficient notices provided in *Berman*, *Chabolla*, and *Godun*, on which Plaintiffs rely. In *Berman*, "[t]he text disclosing the existence of the terms and conditions on these websites [wa]s the antithesis of conspicuous. It [wa]s printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye." *Berman*, 30 F.4th at 856–57. Likewise, in *Chabolla*, "the notice's distance from relevant action items, its placement outside of the user's natural flow, and its font—notably timid in both size and color" was "deemphasized by the overall design of the webpage" and not "prominently displayed." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1157 (9th Cir. 2025). Finally, in *Godun*, the court considered a variety of different advisals all of which were deficient because "the advisal text is printed in relatively small text and not located "directly above or below" the action ("Start my trial") button," or "the color of the advisal text blends into the background and is displayed in a lighter color than other text on the page," or the advisal "failed to explicitly advise users of what action would constitute assent to any terms." *Godun*, 135 F.4th 699, 711-12. Here, while the font used for the advisal is smaller than some of the other text on the page, it is bolded and the Terms of Use hyperlink is in bright blue. It is also conspicuously displayed with clear unambiguous language directly above the "Agree and subscribe button" and states clicking "Agree and subscribe" constitutes agreement to the Terms of Use.

*Morrison v. Yippee Ent. Inc.*, 756 F.Supp.3d 842 (S.D. Cal. 2024), does not persuade the Court otherwise. While sharing some similarities to the disclosure here, the hyperlink to the Terms of Use was not directly above the button the consumer had to click as it is here. Further, the button the consumer clicked said "start subscription" but did not reinforce that by clicking the consumer was agreeing to the Terms of Use. *Id.* at 848. And in *Sadlock v. Walt Disney Co.*, 2023 WL 4869245 (N.D. Cal. July 31, 223), the black background made the text hard to read and the hyperlink to the agreement containing the arbitration clause was "located five lines away from the "Agree and Subscribe" button." *Id.* at 10. Neither of those issues are present here.

Next, the Court considers "the full context of the transaction, such as whether the type of transaction contemplates entering into a continuing, forward-looking relationship that would be

governed by terms and conditions." *Godun*, 135 F.4th at 710 (cleaned up). "For such transactions, it must be clear that consumers agree not only to the one-time purchase, but also to the continuing purchases going forward." *Id.* at 712. The advisal here satisfies this requirement. The button states "Agree and subscribe"; thus, by clicking the button users are advised they are **both** agreeing to the Terms of Use **and** entering into an ongoing relationship with Adobe. *See, e.g.*, *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 471 (2021) (discussing situations where a "consumer [is] signing up for an ongoing account and, thus, it is reasonable to expect that the typical consumer in that type of transaction contemplates entering into a continuing, forward-looking relationship."); *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1020 (9th Cir. 2024) (noting users who download and play a mobile game that includes in-app purchases should expect a continuing relationship with the developer governed by terms of use); *Oberstein*, 60 F.4th at 517 (holding users who make an account with a ticket purchasing website through a "full registration process" should expect "'some sort of continuing relationship' that would have put users on notice for a link to the terms of that continuing relationship.").

Considering the totality of the circumstances here, Adobe's advisal provided reasonably conspicuous notice of the Terms of Use to which subscribers would be bound.

**3. Manifestation of Assent**

"The second step of the inquiry-notice internet contract formation test asks us to consider whether any action taken by the internet user—such as clicking a button or checking a box—'unambiguously manifest[ed] his or her assent' to proposed contractual terms." *Godun*, 135 F.4th at 710 (quoting *Keebaugh*, 100 F.4th at 1018). Unambiguous manifestation of assent occurs only "where an internet user is 'explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement.'" *Godun*, 135 F.4th at 710–11 (quoting *Berman*, 30 F.4th at 857).

As discussed above, Adobe's checkout page includes text directly above the "Agree and subscribe" button stating "By clicking 'Agree and subscribe,' … [y]ou also agree to the Terms of Use and the Subscription and Cancellation Terms." (Dkt. Nos. 44-5, 54-1). This is precisely the type of language *Berman* said would be sufficient to unambiguously manifest assent. *Berman*, 30

F.4th at 858 ("This notice defect could easily have been remedied by including language such as, "By clicking the Continue >> button, you agree to the Terms & Conditions."). There is no dispute Nunez and Brooke clicked the button when they signed up for subscriptions for Adobe Photoshop and Adobe Photoshop and Adobe Stock, respectively.

***

Because Adobe's subscription pages provided reasonably conspicuous notice of the Terms of Use to which subscribers would be bound and Nunez and Brooke unambiguously manifested their assent to the terms by clicking "Agree and subscribe," the parties formed a valid agreement to arbitrate as a matter of law.

**B. The Delegation Clause Encompasses Plaintiffs' Unconscionability Arguments**

The Court now turns to Plaintiffs' arguments regarding the enforceability of the Arbitration Agreement; namely, that the Arbitration Agreement is unconscionable and therefore unenforceable. Adobe insists any enforceability questions are for the arbitrator to decide.

Gateway questions of arbitrability are typically for a court to decide, even when there is a facial agreement to arbitrate. *Portland GE v. Liberty Mut. Ins. Co.*, 862 F.3d 981, 985 (9th Cir. 2017). Gateway questions include "whether the parties have a valid arbitration agreement or are bound by a given arbitration clause, and whether an arbitration clause in a concededly binding contract applies to a given controversy." *Id.* (internal quotation marks and citation omitted). However, "parties may delegate the adjudication of gateway issues if they 'clearly and unmistakably' agree to do so." *Id.*; *see also Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010) ("parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy" through a delegation clause) (internal citation omitted). "[L]anguage delegating to the arbitrators the authority to determine the validity or application of any of the provisions of the arbitration clause[ ] constitutes an agreement to arbitrate threshold issues concerning the arbitration agreement." *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016) (citing *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011) (quoting *Rent-A-Ctr.*, 561 U.S. at 68)).

The Arbitration Agreement here includes a delegation clause:

> The arbitrator, and not any federal, state, or local court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability or enforceability of the Terms or formation of the Terms, including whether any dispute between us is subject to arbitration (i.e., the arbitrator will decide the arbitrability of any dispute) and whether all or any part of these Terms are void or voidable.

(Dkt. No. 44-1 at 35.) While a party can challenge a delegation clause on unconscionability grounds, "the party resisting arbitration must specifically reference the delegation provision and make arguments challenging it." *Bielski v. Coinbase, Inc*., 87 F.4th 1003, 1009-10 (9th Cir. 2023). Here, Plaintiffs do not even mention the delegation clause in their opposition brief, and thus have not challenged the delegation clause on unconscionability grounds. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 72-73 (2010) (concluding the plaintiff had not sufficiently challenged the delegation provision when he only argued that "the arbitration agreement as a whole [was] substantively unconscionable," and "did [not] even mention the delegation provision" in his opposition brief).

Because Plaintiffs do not challenge the delegation clause and the delegation clause clearly and unmistakably delegates the gateway question of arbitrability to the arbitrator in the first instance, an arbitrator, not the Court, must resolve Plaintiffs' unconscionability arguments. So, the motion to compel arbitration must be granted.

**CONCLUSION**

For the reasons explained above, Adobe's motion to compel arbitration of Plaintiff Nunez and Brooke's claims is GRANTED. (Dkt. No. 44.) At Adobe's request, their claims are stayed pending arbitration. *See Smith v. Spizzirri*, 601 U.S. 472, 478 (2024).

This Order disposes of Docket No. 44.

**IT IS SO ORDERED.**

Dated: August 1, 2025

JACQUELINE SCOTT CORLEY
United States District Judge